**BASIC MANAGEMENT INC., a Nevada Corporation; Basic Remediation Company LLC, a Nevada Limited Liability Company; Basic Environmental Company LLC, a Nevada Limited Liability Company, Plaintiffs,**

v.

**UNITED STATES of America, Atlantic Richfield Company, a Delaware Corporation; Combined Metals Reduction Company, a Utah Corporation; Does 1–25; and Does 25–50, Defendants.**

No. 2:02–cv–0884–RCJ–RJJ.

United States District Court,
D. Nevada.

Feb. 25, 2008.

David W. Tundermann, J. Michael Bailey, John B. Wilson, Shane D. Hillman, Richard J. Angell, Parsons Behle & Latimer, Philip M. Ballif, Durham Jones & Pinegar, Salt Lake City, UT, Karl L. Nielson, Jones Vargas, Las Vegas, NV, for Plaintiffs.

Jonathan W. Rauchway, William J. Duffy, Davis Graham & Stubbs LLP, Denver, CO, Thomas F. Kummer, Kummer Kaempfer Bonner Renshaw & Ferrario, Blaine T. Welsh, U.S. Attorney's Office, Las Vegas, NV, Leslie M. Hill, David M. Thompson, U.S. Department of Justice ENRD/EDS, Todd W. Gleason, Environmental Defense Section, Michele L. Walter, Robert H. Foster, U.S. Department of Justice, Washington, DC, for Defendants.

## ORDER

ROBERT C. JONES, District Judge.

This matter comes before the Court on multiple motions for summary judgment. The Court has considered the motions, the pleadings on file, and oral argument on behalf of all parties. For the reasons discussed below, the Court grants the motions in part and denies the motions in part.

## BACKGROUND

Plaintiffs consist of three Nevada corporations, Basic Management, Inc. ("BMI"), Basic Remediation Company, LLC ("BRC"), and Basic Environmental Company, LLC ("BEC"). They initiated a contribution action under the Comprehensive

Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), §§ 107 and 113, 42 U.S.C. §§ 9607 and 9613, regarding land currently owned by Plaintiffs on which Defendants had allegedly disposed waste prior to Plaintiffs' ownership. The site (hereinafter, "the BMI Complex") was initially used for military purposes, primarily a magnesium plant, during World War II, after which the land was divided and changed hands and uses several times.

Defendant United States owned the BMI Complex through several government agencies, including the Defense Plant Corporation ("DPC"), from 1941 until 1949. DPC was organized on August 22, 1940, under the authority of section 5D of the Reconstruction Finance Corporation Act. All of DPC's stock was owned by the Reconstruction Finance Corporation ("RFC"), a corporate entity created and controlled by the federal government. In 1941, the United States authorized the financing, construction, and operation of the Basic Magnesium production facilities at the site.[1] The facility was designed to aid the National Defense Program by producing magnesium, which was used for aircraft construction, bombs, tracer bullets, and other incendiary ammunition. DPC contracted with Basic Magnesium, Inc. ("Basic Magnesium") to construct and operate a wartime magnesium plant in Nevada.

Basic Magnesium was a company formed as a joint venture between Basic Refractories, Inc., an Ohio company, and Magnesium Electron Ltd., a British company. Basic Refractories owned claims to magnesium bearing ore deposits in Nevada through its subsidiary, Basic Ores, Inc., while Magnesium Electron had the "know how" regarding a German-based magnesium production technology. Basic Refractories held 55% of Basic Magnesium's stock while Magnesium Electron held a 45% interest in the company. On August 1, 1941, DPC entered into an agreement with Basic Magnesium[2] to build and operate a magnesium plant in Nevada between Lake Mead and Las Vegas. This 1941 Agreement provided that (1) Basic Magnesium would assist DPC with the acquisition of sites, equipment, machinery, water, power and utilities; (2) title to all real property, buildings, and machinery would vest with DPC; (3) Basic Magnesium would manage and operate the facility on behalf of DPC as an independent contractor for DPC; (4) all persons managing and operating the facility would be employed by Basic Magnesium; and (5) Basic Magnesium was to sell and otherwise dispose of magnesium metal, alloys, and other products from the facility only at the direction of, and for the account of, DPC.

DPC ultimately owned the BMI Complex site in Henderson, Nevada, which consisted of 4,080 acres of land purchased from private individuals (purchased by Basic Magnesium and deeded to DPC on November 27, 1941) and 14,360 acres of land owned by the United States that was withdrawn from all forms of appropriation by Executive Order No. 8927, dated October 29, 1941. Due to problems with Basic Magnesium's management of the facility, the DPC recruited Defendant Atlantic

---

1. The magnesium production facility was originally designated by the United States as "Plancor 201." For ease of reference herein, the Court will refer to Plancor 201 as "the BMI Complex" or the "facility."

2. Basic Magnesium, Inc., was later dissolved in 1941, and a new entity was formed by reorganizing Basic Ores into a nearly identically named company, Basic Magnesium, Incorporated. The dissolution of Basic Magnesium, Inc. assigned the 1941 Agreement to the new Basic Magnesium.

Richfield Company's ("Atlantic Richfield") predecessor in interest, Anaconda Copper Mining Co. ("Anaconda"), to takeover Basic Magnesium and its construction and operation of the facility. The facility included magnesium production facilities, including a chlorine and caustic soda plant, and associated waste disposal areas—primarily evaporation ponds for waste water disposal. Anaconda came to an agreement with DPC and replaced Basic Refractories as Basic Magnesium's controlling shareholder when Anaconda bought 52.5% of its shares in 1942. On October 20, 1942, the United States purchased from Basic Refractories the mining claims located at Gabbs, Nevada, which were the source of magnesite ore for Basic Magnesium. The United States owned the mining claims until 1949, when it, acting through the War Assets Administration and RFC, sold the claims and related BMI Complex facilities and land at Gabbs, Nevada, to Basic Refractories through a series of transactions between 1940 and June 27, 1955.

When Anaconda took over operations at the BMI Complex, it placed its Chief Engineer, Wilbur Jurden, in charge of the design, construction, operation, and maintenance of the magnesium plant. Anaconda placed its officers and directors in identical positions at Basic Magnesium. Additionally, Anaconda provided some staff support to the plant, loaning Anaconda employees to the plant who were paid for by Anaconda. Anaconda expanded the plant's waste management ponds, installed new caustic waste disposal lines from the chlorine plant to the waste water disposal system, acquired waste storage equipment, erected protective fencing, and supervised the operation of other waste management systems.

DPC owned the real property at the BMI Complex from November 1941 through June 30, 1945. The DPC contract with Basic Magnesium provided for the design, construction, and installation of equipment for the entire complex. DPC also owned the equipment, machinery, tools, material, and supplies used to construct and operate the plant. DPC required a full description of every item purchased or acquired by Basic Magnesium and required that it mark or stamp all such items to indicate DPC's ownership. Basic Magnesium could sell magnesium metal, magnesium alloys, and other products produced at the plant but only at the direction of and for the account of the United States. DPC, per contract with Basic Magnesium, owned all the technical expertise or "know how" regarding magnesium production at the facility. In addition to proprietary control, DPC also retained control over production levels at the site.

The facility began production of chlorine on August 3, 1942. It began production of magnesium on August 31, 1942. Magnesium production ceased in November 1944, while the chlorine and caustic soda plant remained in production until May 1945.

RFC held title to the facility from June 30, 1945 through June 3, 1949. On June 3, 1949, RFC transferred a large portion of the site to the State of Nevada, acting by and through the Colorado River Commission of Nevada. In 1952, the principal tenants of the site purchased the majority of the land from the United States and formed one of the corporate plaintiffs, BMI, which thereafter managed the property. The United States Navy also used a portion of the site from 1953 until 1962, during which time it operated an ammonium perchlorate plant. BMI acquired the remainder of the land from the United States Navy in 1962. By 1976, tenants on the property used only the lined drainage ditches and ponds at the site for waste disposal.

During the 1980s, the land was examined for potentially harmful soil and groundwater risks. The contaminants found at the site include: volatile organic compounds ("VOCs"), semivolatile organic compounds ("SVOCs"), pesticides, polychlorinated biphenyls ("PCBs"), dioxins and difurans, metals, perchlorate, radionuclides, and asbestos.

In 1991, certain former owners and then-current owners and operators of the BMI Complex entered into the first of a series of consent agreements with the State of Nevada Division of Environmental Protection ("NDEP"). NDEP began a series of testing and cleanup procedures for the site. Plaintiffs were not parties to the 1991 agreement. Several entities, including Plaintiffs, entered into a second consent agreement with NDEP in 1996. On June 29, 1999, Plaintiffs and other non-party PRPs signed the BMI et al. Settlement Agreement and Release, also known as the "Soils Settlement Agreement." On February 22, 2002, Plaintiffs and other non-party PRPs signed the BMI/Montrose Groundwater Settlement Agreement and Release, also known as the "Groundwater Settlement Agreement." On February 15, 2006, several entities, including Plaintiffs, entered into a third, superceding settlement agreement with the NDEP. Plaintiffs allege that they have incurred in excess of $22 million in response costs investigating, characterizing, and remediating releases of hazardous substances at the site.

Plaintiffs are named insureds on two insurance policies covering soils and groundwater contamination at the BMI Complex. These policies were issued by American International Specialty Lines Insurance Company ("AISLIC"), a member of the AIG Insurance Group, in 1999 and 2002 respectively. The premiums for the policies were paid by other PRPs, who are not parties to this lawsuit. Specifically, the Soils Settlement Agreement set up an escrow account used to purchase an insurance policy for soils contamination covering remediation costs, third party claims for clean-up costs, bodily injury and property damage, and legal expenses. Similarly, the Groundwater Settlement Agreement established an escrow account used to purchase an insurance policy covering remediation costs, third party claims for clean-up costs, bodily injury and property damage, and legal expenses for groundwater contamination and related pollution conditions not covered by the soils policy.

Under the soils and groundwater policies, investigation and remediation costs at the BMI Complex have been pre-funded and capped. The invoices for Plaintiffs' clean up and response costs are submitted directly to AISLIC and the carrier pays the vendors directly. All claims submitted to AISLIC pursuant to those policies have been paid, totaling approximately $22 million to date. Plaintiffs claim that remediation costs for soils that were incurred before the inception of the soils insurance policy total $839,244. They claim that remediation costs incurred for groundwater characterization before the inception of the groundwater policy total $51,624. Thus, the pre-insurance response costs incurred by Plaintiffs total $890,868.

In 2002, Plaintiffs initiated a cost recovery and contribution action to recover a portion of the costs of the cleanup of the site from the Defendants as other potentially responsible parties ("PRP") under §§ 107(a) and 113(f)(3)(B) of CERCLA. Plaintiffs seek contribution and recovery of expenses incurred in connection with the remediation of hazardous waste at the BMI Complex and request declaratory relief with respect to future remediation costs pursuant to § § 107 and 113 of CERCLA.

The following motions are currently before the Court for consideration:

(1) Defendant Atlantic Richfield Company's Motion for Summary Judgment on Direct Liability (# 218);

(2) Defendant Atlantic Richfield Company's Motion for Summary Judgment on Alter Ego Liability (# 219);

(3) Plaintiffs' Motion for Partial Summary Judgment for Atlantic Richfield's Liability as a Responsible Party Under CERCLA (# 237);

(4) Plaintiffs' Motion for Summary Judgment for United States' Liability as a Responsible Party Under CERCLA (# 280);

(5) Defendant United States' Motion for Summary Judgment (SEALED) (# 312); and

(6) Defendant Atlantic Richfield Company's Motion for Summary Judgment on Relief Sought by Plaintiffs (SEALED) (# 314).

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The purpose behind summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the Court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir.1994). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Warren v. Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995).

The moving party bears the burden of informing the court the basis for its mo-tion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in his pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II. *CERCLA Liability*

Congress enacted CERCLA to encourage the timely cleanup of hazardous waste sites by placing cleanup cost liability on those responsible for creating or maintaining the condition. CERCLA § 113(f) governs contribution claims, such as this one, and provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section [107(a)] of this title ..." 42 U.S.C. § 9613(f)(1). Further, "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not a party to a settlement. ..." *Id.* at § 9613(f)(3)(B). "Person" is defined in the statute as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9101(22). A contribution action under § 113(f) must be commenced no more than three years after the date of such an administrative or judicially approved settlement. *Id.* at § 9613(g)(3)(B).

CERCLA § 107 governs cost recovery actions, defines four categories of poten-

tially responsible parties ("PRPs"), and makes them liable for, among other things, "any other necessary costs of response incurred by any other person consistent with the national contingency plan." *Id.* at § 9607(a)(4)(A)-(B). A cost recovery action must be commenced within six years after initiation of physical on-site construction of the remedial action. *Id.* at § 9613(g)(2)(B). To prevail in a private cost recovery action, Plaintiffs must establish that: (1) the site on which the hazardous substances are contained is a "facility" as defined by CERCLA, (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, (3) such "release" or "threatened release" caused Plaintiffs to incur response costs that were "necessary" and "consistent with the national contingency plan," and (4) the defendant is within one of four classes of persons subject to liability. 42 U.S.C. § 9607; *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 870–71 (9th Cir.2001) (en banc) (*Carson Harbor I*); *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1300 (9th Cir.1997). The four classes of PRPs subject to CERCLA liability include: (1) current owners and operators of the facility, (2) past owners and operators of the facility at the time of disposal, (3) arrangers, and (4) transporters. 42 U.S.C. § 9607(a)(1)-(4). A private party may maintain an action under both CERCLA §§ 107(a) and 113(f) against other PRPs to recover expenses associated with cleaning up a contaminated site: *United States v. Atlantic Research Corp.*, 551 U.S. ——, 127 S.Ct. 2331, 168 L.Ed.2d 28 (2007).

### A. Liability vis-a-vis Atlantic Richfield

Defendant Atlantic Richfield and Plaintiffs filed cross-motions for summary judgment as to Atlantic Richfield's liability. (*See* # # 218, 219, and 237.) The Court agrees with the parties that summary judgment is appropriate at this time because a trial would not provide any further evidentiary basis for a resolution of liability.

The issue before the Court is whether Atlantic Richfield is a covered person, or PRP, who may be liable under CERCLA. Plaintiffs claim that Atlantic Richfield, through its predecessor Anaconda, is liable as a past operator of the BMI Complex and an arranger for the disposal of hazardous substances at the facility. Plaintiffs assert that Atlantic Richfield is both directly liable for Anaconda's own actions as an operator and arranger as well as derivatively liable under a veil piercing theory that Anaconda was the alter ego of Basic Magnesium. Atlantic Richfield contests liability on both theories, but it does not contest successor liability if Anaconda was an operator or arranger.

### 1. Direct Liability

Atlantic Richfield argues in its Motion for Summary Judgment on Direct Liability (# 218) that Plaintiffs cannot show that Atlantic Richfield's predecessor, Anaconda, either (1) directly operated the magnesium production facility at the BMI Complex, or (2) arranged for the disposal of hazardous waste at the BMI Complex. Essentially, Atlantic Richfield claims that Anaconda's relationship with its subsidiary, Basic Magnesium, was within the accepted norms of the parent-subsidiary relationship, and thus, the parent cannot be held liable for the actions of its subsidiary. Plaintiffs argue that Anaconda's control over Basic Magnesium so permeated its day-to-day activities that Anaconda was in direct control of and managed the operations of the Basic Magnesium facility.

### a. Operator

■ The seminal case on liability of a parent corporation is *United States v.*

*Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). The Supreme Court found that nothing under CERCLA "bars a parent corporation from direct liability for its own actions in operating a facility owned by its subsidiary." *Id.* at 65, 118 S.Ct. 1876. Thus, "the parent is directly liable for its own actions." *Id.* Under *Bestfoods,* the test for determining whether a parent corporation may be held directly liable as an operator of a facility run by its subsidiary is "not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary." *Id.* at 68, 118 S.Ct. 1876. Accordingly, an "operator" in this context "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67, 118 S.Ct. 1876.

In evaluating whether the parent corporation directly operated the facility, the Court must look to the actions of the parent's officers, directors, and managers at the subsidiary's facility to determine the extent of their involvement. The Court recognized that there are three scenarios in which the parent can be held directly liable for its actions:

(1) when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture; ...

(2) [where] a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility; ... [and]

(3) [where] an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility.

*Id.* at 71, 118 S.Ct. 1876.

However, the dual relationship of joint officers and directors in itself is not sufficient to establish liability. "[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *Id.* at 69, 118 S.Ct. 1876 (citations and internal quotations omitted). Moreover, "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately despite their common ownership." *Id.* (citations and internal quotations omitted). "Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary, it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility." *Id.* at 69–70, 118 S.Ct. 1876. Indeed, the Court must distinguish "a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility. Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." *Id.* at 72, 118 S.Ct. 1876 (internal quotations and citations omitted). Hence, "[t]he critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under the accepted norms of parental oversight of a subsidiary's facility." *Id.*

This question of "eccentricity" is the gravamen of the parties' disagreement

over direct liability. Atlantic Richfield argues that Anaconda's actions at the BMI Complex were consistent with a parent's normal oversight over its subsidiary, whereas Plaintiffs argue that the same actions establish Anaconda's control over the operation of Basic Magnesium's facility. Both parties use the same facts to support their interpretations. These facts include overlapping managers, directors, and employees of Anaconda and Basic Magnesium, Anaconda's involvement in building, engineering design, and daily operations of the facility, and Anaconda's involvement in the design and funding of waste management and disposal systems. Atlantic Richfield asserts that Anaconda's role is consistent with the norms of parental supervision of a subsidiary and are akin to the role played by a consultant. However, Plaintiffs have shown sufficient involvement by Anaconda beyond the norms of parental supervision to establish that Anaconda was an operator of the facility, thereby rendering Atlantic Richfield directly liable for its actions.

### b. Arranger

■■■ Arranger liability under CERCLA arises when "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3). The term "arranged for" is not defined in CERCLA. The "issues involved in determining 'arranger' liability under CERCLA are distinct from those involved in determining 'owner' or 'operator' liability." *Coeur D'Alene Tribe v. Asarco, Inc.*, 280 F.Supp.2d 1094, 1130–31 (D.Idaho 2003), citing *Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562, 564 (9th Cir.1994). Indeed, "ar-

ranger liability requires active involvement in the arrangements of disposal of hazardous substances. However, control is not a necessary factor in every arranger case. The Court must consider the totality of the circumstances ... to determine whether the facts fit within CERCLA's remedial scheme.... [T]here must be a 'nexus' that allows one to be an arranger." *Id.* at 1131 (internal citations omitted).

There are two lines of cases in the area of direct arranger liability: (1) "traditional" arranger liability cases in which "the sole purpose of the transaction is to arrange for the treatment or disposal of the hazardous wastes," *United States v. Shell Oil Co.*, 294 F.3d 1045, 1054 (9th Cir.2002) (citations omitted), and (2) "broader" arranger liability, in which "control is a crucial element of the [fact-specific] determination of whether a party is an arranger." *Id.* at 1055. With respect to the broader arranger liability, the court noted that "[t]here is no bright-line test, either in the statute or in the case law, for a broad theory of arranger liability under § 9607(a)(3). Rather, we are required to sort through the fact patterns of the decided cases in order to find similarities and dissimilarities to the fact pattern of our case." *Id.* at 1055–56. After evaluating the cases identified by the *Shell Oil* court as broader arranger liability cases, the applicable standard was identified by one district court as follows: "Arranger liability requires a person to: (1) own or possess waste and arrange for its disposal; or (2) have the authority to control and to exercise some actual control over the disposal of waste." *Coeur D'Alene Tribe*, 280 F.Supp.2d at 1132.

This is not a traditional arranger liability case. Hence, the Court looks at the control Anaconda had over the disposal of waste under the broader theory of arranger liability. Plaintiffs use the same facts

to argue Atlantic Richfield's arranger liability as operator liability and have shown that Atlantic Richfield, through its predecessor Anaconda, possessed waste and arranged for its disposal and had the authority to control and exercised some actual control over disposal of the waste. Atlantic Richfield is therefore liable as an arranger.

### 2. Derivative Liability

Plaintiffs contend that the very same actions by Anaconda's personnel that render Atlantic Richfield directly liable due to Anaconda's operation of the facility also render Atlantic Richfield Page 13 of 30 derivatively liable under the theory that Basic Magnesium was Anaconda's alter ego. Atlantic Richfield disputes this contention and asserts that there is no evidence to support veil piercing in this case.

The Supreme Court acknowledged in *Bestfoods* that "[c]ontrol of the subsidiary, if extensive enough, gives rise to indirect liability under the statutory language" of CERCLA. 524 U.S. at 68, 118 S.Ct. 1876. However, the Court differentiated between direct operator liability and indirect derivative liability, stating: "Indeed, if the evidence of common corporate personnel acting at the management and directorial levels were enough to support a finding of a parent corporation's direct operator liability under CERCLA, then the possibility of resort to veil piercing to establish indirect, derivative liability for the subsidiary's violations would be academic." *Id.* at 70, 118 S.Ct. 1876. Consequently, there is a higher threshold for Plaintiffs to surmount in order to establish that Anaconda was Basic Management's alter ego and thus, warranting a veil piercing finding.

It is unclear whether the Court is obliged to apply federal common law or Nevada law in determining whether to pierce the corporate veil for purposes of derivative CERCLA liability. *See Best-*

*foods,* 524 U.S. at 64 n. 9, 118 S.Ct. 1876 ("There is significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil piercing."). The Ninth Circuit has not spoken on the issue.

CERCLA itself states that with respect to § 113(f) contribution actions, "[s]uch claims ... shall be governed by Federal Law." 42 U.S.C. § 9607(f)(1). Additionally, the Supreme Court has held that applying federal law is appropriate where (1) national uniformity in law is needed with respect to federal programs, (2) application of state law would frustrate the objectives of the federal programs, and (3) application of a federal rule would not otherwise disrupt commercial relationships predicated on state law. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728–29, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). On the other hand, courts have looked to state law in other areas of CERCLA liability. *See Bestfoods,* 524 U.S. at 64 n. 9, 118 S.Ct. 1876; *Atchison, Topeka and Santa Fe Railway Co. v. Brown & Bryant, Inc.,* 159 F.3d 358 (9th Cir.1997). However, the Court need not decide whether to apply state law or federal common law as Plaintiffs have not met their burden to show that veil piercing is appropriate under either standard.

Under Nevada law, the following requirements must be met to pierce the corporate veil: (1) the corporation is influenced and governed by the stockholder asserted to be its alter ego; (2) there must be such unity of interest and ownership that corporation and the stockholder are inseparable from each other, and (3) adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice. N.R.S. § 78.747; *Lorenz v. Beltio, Ltd.,* 114 Nev. 795, 963 P.2d 488, 496 (1998); *Rowland v.*

*Lepire,* 99 Nev. 308, 662 P.2d 1332, 1337 (1983); *see also Goff ex rel. Estate of Torango v. Harrah's Operating Co.,* 392 F.Supp.2d 1244, 1245 (D.Nev.2005). The Ninth Circuit alter ego test requires consideration of: (1) the amount of respect given to the separate identity of the corporation by its shareholders, (2) the fraudulent intent of the incorporators, and (3) the degree of injustice visited on the litigants by recognition of the corporate entity. *Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.,* 969 F.2d 764, 769 (9th Cir.1992); *see also Bd. of Trs. v. Valley Cabinet & Mfg. Co.,* 877 F.2d 769, 772 (9th Cir.1989).

■ Plaintiffs have not shown that Anaconda's involvement in Basic Magnesium's operations are so extensive as to render Basic Magnesium a sham or "dummy" corporation under either state law or federal law. Indeed, Basic Magnesium did have many separate employees, officers, directors, and managers who were not related to Anaconda, a separate corporate structure, separate finances and contracts in its own name, among other differences. Most importantly, Plaintiffs have not shown any fraudulent intent on the part of the incorporators or any manifest injustice resulting from the separate corporate identity. Anaconda's financial motivations in acquiring Basic Magnesium do not support a finding of fraud. Accordingly, piercing the corporate veil here is inappropriate, and Atlantic Richfield is not derivatively liable under an alter ego theory.

### B. *Liability vis-a-vis the United States*

Defendant United States and Plaintiffs filed cross motions for summary judgment as to the liability of the United States. (*See* # # 280, 312.) Plaintiffs claim that the United States is liable under CERCLA as a past owner [3] of the BMI Complex and arranger for the disposal of hazardous substances at the facility. Specifically, Plaintiffs claim that the United States is liable for contamination of the site for its World War II magnesium plant operations and for its involvement with an ammonium perchlorate facility from 1945 to 1962. The United States argues that it has long ago admitted it was an owner during World War II and thus a "covered person" under CERCLA, Plaintiffs previously waived any claim for post-World War II wastes, and there is no basis to establish the United States as an "arranger" under CERCLA. Additionally, in its Motion (# 312), the United States argues that Plaintiffs failed to establish that they have (1) "incurred" (2) "response" costs that are (3) "necessary" and (4) "consistent with the national contingency plan" as required by CERCLA to maintain a private party contribution action.

Given the United States' admission of ownership of the BMI Complex during World War II, the issues before the Court are (1) whether Plaintiff waived any post-World War II era claims against the United States, (2) whether the United States is an "arranger," and (3) whether Plaintiffs have satisfied the statutory requirements for maintaining a private party contribution action.

### 1. *Waiver of Post–World War II Era Claims*

The United States argues that Plaintiffs waived their claims against the United

---

**3.** Although Plaintiffs claim that the United States is also liable as an "operator," they do not seek summary judgment on liability on this issue and "specifically reserve that issue for trial." Plaintiffs only seek summary judgment on the United States' liability as an owner and arranger. (*See* Pltfs' Memorandum in Support of Pltfs' Mtn. for Summ. Jmt. Against the United States of America, # 280, at 2 n. 2).

States for disposal of post-World War II wastes at the facility. The United States argues that Plaintiffs conceded the issue in earlier briefs in this case and should not be allowed to renounce their concession. Plaintiffs, however, have asserted the United States' post-wartime liability consistently in their original Complaint, First Amended Complaint, and Second Amended Complaint. Thus, the Court finds the waiver argument unpersuasive.

### 2. *Arranger Liability*

■ Again, this is not a case of traditional arranger liability. Looking then at the broader theory of arranger liability, "[a]rranger liability requires a person to: (1) own or possess waste and arrange for its disposal; or (2) have the authority to control and to exercise some actual control over the disposal of waste." *Coeur D'Alene Tribe*, 280 F.Supp.2d at 1132. Plaintiffs have shown that the United States had the authority to control and exercise some actual control over the disposal of waste at the BMI Complex. The United States owned the raw materials, the process materials, the products and by-products, and the wastes, before, during and after processing; it contracted for the building of the complex including waste disposal facilities; and it knew and approved of the waste disposal activities at the facility. Therefore, the United States is liable as an arranger.

### 3. *Contribution Action Requirements*

In order to maintain a contribution claim under § 113(f)(3)(b), "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicial-

ly approved settlement may seek contribution from any person who is not a party to a settlement ..." 42 U.S.C. § 9613(f)(3)(B). Additionally, Plaintiffs must establish that: (1) the site on which the hazardous substances are contained is a "facility" as defined by CERCLA, (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, (3) such "release" or "threatened release" caused Plaintiffs to incur response costs that were "necessary" and "consistent with the national contingency plan," and (4) the defendant is within one of four classes of persons subject to liability. 42 U.S.C. § 9607. There is no dispute among the parties that the BMI Complex is a "facility" at which there was a "release" of a "hazardous substance." The issues arise over whether Plaintiff "incurred" "response costs" that were "necessary" and "consistent with the national contingency plan." [4]

### a. **Incur**

■ In order to seek contribution for costs under CERCLA, Plaintiffs must actually "incur" costs. However, CERCLA itself does not define the term "incur," nor does any case law. The United States urges the Court to look to the dictionary definition of "incur" as "to become liable or subject to." American Heritage Dictionary (4th ed.2000). The United States argues that under this definition, Plaintiffs have not "incurred" any costs "because they are not responsible for or subject to the costs. Instead, they obtained two insurance policies, one covering soils and one covering groundwater, rendering the insurance company liable for all costs pursuant to the terms of the polices." (U.S. Mtn for Summ. Jmt. # 312, at 24.) The

---

**4.** The national contingency plan is a set of regulations promulgated by EPA pursuant to CERCLA § 105, 42 U.S.C. § 9605, which sets forth the standards and procedures required for CERCLA response actions. 40 C.F.R. Part 300, *et seq.*

United States also claims that the insurance companies have waived their rights to subrogation in this matter.

Indeed, the vast majority of Plaintiffs' costs have been paid directly by their insurance policies from AISLIC. However, insurance payments do not amount to "shifting liability" to the insurance companies, thereby contractually absolving Plaintiffs from liability. Plaintiffs are still ultimately liable, under CERCLA, for their role in the contamination of the BMI Complex. Under this analysis, Plaintiffs have "incurred" liability for the cleanup. However, the Court believes that the term "incurred" costs is more specific than that. Rather, the term should include the requirement that a Responsible Party has or will actually incur the specific cost for which it seeks contribution. Otherwise, they are only obtaining a contribution windfall for a cost which they will never incur or have to pay. While it is true that Plaintiffs could have paid for the costs themselves and submitted those claims to AISLIC for reimbursement under the insurance polices, the fact remains that AISLIC pays the vendors directly and is obligated to do into the future. While the Court agrees that Plaintiffs have incurred liability for the cleanup, it concludes that Plaintiffs have not incurred the specific costs directly paid by or reimbursable by the insurer.

### b. Response Costs

■ The United States asserts that Plaintiffs' costs, if incurred by them, totaling over $22 million to date, are not recoverable "response costs" under CERCLA. Response costs are costs incurred in relation to assessing, monitoring, cleaning, and removing released hazardous substances, minimizing damage to the public health or environment from the hazardous substances, and achieving a permanent remedy. *See* 42 U.S.C. § 9601(23)-(25) (defining "response," "remove," "remedy," and "removal action"). Plaintiffs have submitted ample evidence that these costs at the BMI Complex for investigating, characterizing, and remediating the contamination are costs of response. The Court finds that the Plaintiffs' costs, to the extent incurred by them, are response costs under CERCLA.

### c. Necessary

■ CERCLA does not define the term "necessary," and again, the United States urges the Court to look to the ordinary meaning of the word as "indispensable" or "absolutely essential." American Heritage Dictionary (4th ed.2000). The Ninth Circuit has focused on "whether there is a threat to human health or the environment and whether the response action is addressed to that threat." *Carson Harbor I*, 270 F.3d at 872.

The United States argues that the costs claimed by Plaintiffs were not "necessary" because they chose the most expensive of three alternatives for cleanup of the site. Specifically, the United States claims that the $10 million option of on-site capping of soils was all that was "necessary" to remediate the site. Instead, Plaintiffs chose the much more expensive $74 million option of excavation and disposal of soils at an on-site landfill in order to meet residential land use standards for the cleanup. The United States argues that this was not cost-effective and was far more than necessary to address the threat to human health and the environment, motivated solely by Plaintiffs' intent to profit from sale of the property to residential developers, simply making the land more valuable for subsequent resale or development. Plaintiffs argue that CERCLA does not require the least expensive method of response, that their motive is irrelevant, and the option

selected was the one approved by the NDEP.

There is no authority supporting the United States' argument that the term "necessary" requires that the least expensive clean-up option be used for the site. The Court disagrees with the United States' argument that "cost-effective" inherently means "least expensive." Rather, "cost-effective" must refer to the most cost effective method for alleviating the threat to human health and the environment in the specific location, surroundings and likely uses for the land. For example if land is located in a wilderness or broad desert area, costs required to prepare the land for further development or residential use under state or zoning residential requirements would be inappropriate for contribution recovery. On the other hand, if the property is in the middle of other high density residential or commercial uses, full remediation of potential health and environmental hazards would be greater. Similarly, if the pollution effects can be expected to travel underground to other residential or environmentally sensitive sites, simple overhead encapsulation may be insufficient under this law. Given the site's location in Henderson, Nevada, and its proximity to residential developments, it is reasonable to conclude that the more expensive excavation option to meet a higher cleanup standard was necessary to address the threat to human health and the environment.

### d. Consistency with the National Contingency Plan

■ The United States argues that Plaintiffs' actions at the site are not consistent with the National Contingency Plan ("NCP") as required by CERCLA. Specifically, the United States contends that the Plaintiffs' actions are deficient because: (1) there was not (and will not be before the cleanup) an appropriate remedial investigation/feasibility study ("RI/FS") incorporating both a baseline risk assessment and identification of all applicable or relevant and appropriate requirements ("ARARs"), (2) they failed to select a cost-effective remedy (discussed above), (3) and they failed to ensure a "CERCLA-quality cleanup" because the agreement with NDEP does not meet CERCLA standards, they cleaned two portions of the site under less stringent response action requirements instead of more stringent remedial action requirements, and there was not meaningful public participation. Plaintiffs contest these allegations by pointing out that they have done the appropriate types of investigations and studies, they selected a cost-effective remedy which does not equate with the cheapest alternative available, and they performed a CERCLA-quality cleanup "substantially" in compliance with the NCP as required by CERCLA. Plaintiffs also assert that whether they incurred response costs necessary and consistent with the NCP presents disputed issues of material fact that are appropriate for trial.

The Court does not agree that this issue presents disputed issues of material fact precluding summary judgment. However, consistency with the NCP is not an element of CERCLA liability, but rather, a factual issue effecting which response costs Plaintiffs may recover. *See Vine Street,* 460 F.Supp.2d at 759, citing *Amoco Oil v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir. 1989) (establishing the general prima facie elements of CERCLA liability). Because the vast majority of the response costs herein were paid for by Plaintiffs insurance policies, and are unrecoverable as explained below, the issue of whether pre-insurance costs incurred are consistent with the NCP is one that remains for a subsequent allocation trial.

## III. *Relief*

Having determined that both Atlantic Richfield and the United States are responsible parties for the disposal of hazardous wastes under CERCLA and Plaintiffs' directly incurred response costs to clean up those wastes, the Court must now address whether Plaintiff can properly recover those costs in this action. Atlantic Richfield moves for summary judgment against Plaintiffs claiming that (1) they have not met the statutory requirements for maintaining a contribution action under § 113, (2) they are prevented from obtaining a double recovery of their response costs, and (3) declaratory relief is inappropriate because there is insufficient evidence to establish future liability and the total amount of response costs is unknown at this time. (*See #* 314.) Similarly, the United States argues in its motion for summary judgment against Plaintiffs that (1) they have not met the statutory requirements for maintaining a contribution action under § 113, and (2) they are prevented from obtaining a double recovery of their response costs. (*See #* 312.)

### A. Resolution of Liability

■ In order to maintain a contribution claim under § 113(f)(3)(b), "[a] person who has resolved its liability to the United States or a State for *some or all* of a response action or for *some or all* of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not a party to a settlement ... " 42 U.S.C. § 9613(f)(3)(B) (emphasis added). Defendant Atlantic Richfield asserts that Plaintiffs' Agreements with NDEP, and particularly the 2006 Agreement, do not satisfy the criteria for a settlement that resolved Plaintiffs' liability at the site, and therefore, Plaintiffs are precluded from obtaining the relief sought against Atlantic

Richfield. Additionally, Atlantic Richfield asserts that any costs incurred prior to the 2006 Agreement (under the 1991 and 1996 Agreements) are barred by the three-year statute of limitations in CERCLA for contribution actions.

The plain language of § 113(f) states that a person "who has resolved its liability" to a State for "some or all of a response action" in "an administrative ... settlement" may seek contribution. *Id.* It is apparent in this case that Plaintiffs have resolved some of their liability to the State of Nevada (NDEP) for some of the response action. The settlement satisfies this criteria even though portions of the response action (pertaining to two specific chemicals and the Las Vegas Wash) have been excluded from the 2006 Agreement.

Under § 113(g)(3), the party has three years from the date of the settlement to file a contribution claim. *Id.* at § 9613(g)(3)(B). The Plaintiffs filed this action on June 27, 2002. (Complaint, # 1.) That was within three years of the Plaintiffs' soils agreement, so the statute of limitations has been met.

### B. Recoverable Response Costs

■ Both Atlantic Richfield and the United States argue that Plaintiffs should be precluded from recovering any costs that have been paid under their insurance policies because CERCLA bars double recovery. Further, the insurance company is not a party nor does it have any subrogation or contribution rights that can be prosecuted by Plaintiffs. Additionally, Defendants argue that certain categories of costs claimed by Plaintiffs, such as attorney fees, expert witness fees, and costs not consistent with the NCP, are not recoverable.

CERCLA § 114 provides that:

Any person who received compensation for removal costs or damages or claims

pursuant to this chapter shall be precluded from recovering compensation for the *same removal costs* or damages or claims pursuant to any other State or Federal law. Any person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this chapter.

42 U.S.C. § 9614(b) (emphasis added). A plain reading of this statutory language favors Defendants' interpretation that the double recovery bar prevents Plaintiffs from recovering costs paid by AISLIC. Plaintiffs argue that the statute only bars double recovery from the same parties under different causes of action. The Court disagrees. Plaintiffs' insurers are billed directly for response costs and have paid all costs for the past eight years. Permitting Plaintiffs to recover those costs again constitutes a double recovery.

Plaintiffs argue that they should not be precluded from receiving the costs that they are entitled to under CERCLA simply because they had the foresight to purchase insurance. Plaintiffs cite to the "collateral source rule" in tort law as precluding Defendants from offsetting their CERCLA liability with any insurance monies received by Plaintiffs. Restatement (Second) of Torts § 920A, 920 (1979). The collateral source rule provides that if an injured party received some compensation for injuries from an outside source, independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor. *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534–535 (9th Cir.1962); *see generally* 22 Am. Jur.2d *Damages* § 392 (2003); *Bass–Davis v. Davis*, 122 Nev. 442, 134 P.3d 103, 110 (2006). Plaintiffs urge the Court to adopt the collateral source rule in the instant case, although there is no authority supporting application of the rule in a CERCLA context.

In *Gypsum Carrier*, the Ninth Circuit applied the collateral source rule in a Jones Act claim. As Plaintiffs correctly point out, the Jones Act is a federal negligence statute that allows any seamen who suffer personal injury in the course of their employment to maintain an action for damages at law. 46 U.S.C. § 688. The Ninth Circuit held in *Gypsum Carrier* that the injured seaman plaintiff, who had received disability payments from the California Disability Fund, could not have his recovery under the Jones Act reduced by the collateral payments. The court further held that it accepted the collateral source rule "as applicable to the computation of damages in Jones Act litigation," just as other federal courts had in suits resting upon the Federal Employers' Liability Act. 307 F.2d at 535. In so holding, the court stated that:

> The question is not whether a windfall is to be conferred, but rather who shall receive the benefit of a windfall which already exists. As between the injured person and the tortfeasor, the former's claim is the better, This may permit a double recovery, but it does not impose a double burden. The tortfeasor bears only the single burden for his wrong. That burden is imposed by society, not only to make the plaintiff whole, but also to deter negligence and encourage due care.

*Id.* at 534. However, the court noted: "Furthermore, damages for personal injury are usually not, and as a practical matter cannot be, fully compensatory. The additional recovery will rarely make the injured person more than whole." *Id.*

Unlike cases that sound in tort, including those under the Jones Act, CERCLA

contribution actions are not injury actions in which the injured party is seeking compensation for damages to be made whole again. Rather, in the context of a CERCLA contribution action, the environment is the injured party and the parties responsible for causing that injury who fronted the money to fund the repair of that environmental damage are entitled to reimbursement from the other responsible parties to the extent of their shared or allocated liability. In other words, Plaintiffs have not been damaged and are not "entitled" to money as a damaged party; but rather, Plaintiffs can only receive reimbursement for the costs they expended beyond their share of actual responsibility for the environmental damage. There is an actual dollar amount associated with those costs, and in this case, almost all of those costs have been paid directly by Plaintiffs' insurers, and without further right of subrogation in the insurers. In other words, no party or potential party here has incurred a cost as a PRP for which they could seek "contribution" from another PRP. Allowing Plaintiffs to recover those costs "again" from Defendants would in essence allow Plaintiffs to profit from their own and prior contamination of the site simply because they are in the subsequent chain of title. The purpose of the Contribution element of CERCLA was to reallocate the remedial cost to those who were ultimately responsible for the pollution, not to provide a windfall recovery for parties who happen to be in the chain of title. That is undoubtedly the reason for the addition of the prohibition against double recovery in this very statute.

In this vein, the court's opinion in *Vine Street, LLC v. Keeling*, 460 F.Supp.2d 728 (E.D.Tex.2006), is instructive. In *Vine Street*, the plaintiff received reimbursement of its response costs from two other PRPs through their insurer. The court agreed with the defendant's argument that the plaintiff should not recover its reimbursed response costs and that, at most, it should be able to recover only its net costs. 460 F.Supp.2d. at 764. The court, having found no "previous instance in which a private CERCLA claimant received reimbursements for nearly all its past and present response costs prior to any adjudication of responsibility," looked to the cases addressing the issue of double recovery generally for guidance. *Id.* at 764. The *Vine Street* court explained:

> In government-prosecuted CERCLA actions, a non-settling responsible party's liability for the government's response costs is reduced by the dollar amount of previous settlements with the government. . . . The settling party's actual responsibility for the contamination is irrelevant to this reduction requirement. *See O'Neil*, 682 F.Supp. at 730. Once the CERCLA claimant obtains complete recovery from one or more responsible parties, that claimant cannot obtain additional recovery under CERCLA because this would create impermissible double recovery. *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 148–49 & n. 7 (3d Cir.1999) (adopting the common law "one satisfaction rule" from Restatement (Second) of Judgments § 49 cmt. A. (1982)).

*Id.* at 765 (citing 42 U.S.C. § 9613(f)(2); *see United States v. Broderick Inv. Co.*, 955 F.Supp. 1268, 1277 (D.Colo.1997), *rev'd in part on other grounds sub. nom. United States v. Burlington N.R. Co.*, 200 F.3d 679, 699–700 (10th Cir.1999); *O'Neil v. Picillo*, 682 F.Supp. 706, 730 (D.R.I.1988)). The court continued:

> Other CERCLA provisions also reflect Congress's apparent desire to prevent claimants from recovering the same response costs twice. *See, e.g.,* 42 U.S.C. §§ 9612(f) (prohibiting double recovery of response costs and other particular

costs from the Hazardous Substance Superfund), and 9614(b) (prohibiting claimants from recovering CERCLA response costs already recovered under other federal or state law). Thus, a court may consider " 'preventing someone from recovering for the same harm twice' " as an equitable factor in resolving CERCLA contribution claims. *W. Props. Serv. Corp. v. Shell Oil Co.,* 358 F.3d 678, 691 (9th Cir.2004) (quoting *Boeing Co. v. Cascade Corp.,* 207 F.3d 1177, 1189 (9th Cir.2000)). This is consistent with the fact that private CERCLA claimants cannot recover damages resulting from contamination, but can only be reimbursed for some or all of their incurred response costs.... Vine Street cannot make a profit on the contamination.

*Id.* (citing *Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 91 (2d Cir.2000); *see Young v. United States,* 394 F.3d 858, 862 (10th Cir.2005) ("CERCLA is not a general vehicle for toxic tort claims.")).

Like Plaintiffs in this case, the plaintiffs in *Vine Street* also argued that the collateral source rule should prevent the Court from reducing their recovery by what had already been reimbursed. The court rejected the argument as follows:

> The collateral source rule generally precludes a tortfeasor from obtaining the benefit of payments to the injured party from sources other than the tortfeasor. [citations omitted]. However, even if the Court were to agree with Vine Street that Texas substantive law applies to this issue, no court has ever applied the collateral source rule—a tort doctrine—in the context of a CERCLA response-cost reimbursement. Because CERCLA is not a vehicle for general tort recovery and the Court has a broad duty to consider facts bearing on the proper equitable allocation of response

costs, the monies Vine Street has already recovered are relevant.

*Id.* The court further stated: "equity prohibits a CERCLA claimant from being reimbursed more than once for the same response costs." *Id.* at 765–66.

The Court declines to apply the collateral source rule to the recovery of response costs in this CERCLA contribution action. The field has been preempted by the federal statutory mandate of CERCLA § 114. U.S. Const. Art. VI, cl. 2 ("This Constitution and the Laws of the United States ... shall be the Supreme Law of the Land ..."); *Aloha Airlines, Inc. v. Hawaii Dir. of Taxation,* 464 U.S. 7, 12, 104 S.Ct. 291, 78 L.Ed.2d 10 (1983) (state law superseded by plain language of federal statute). Equity and common sense further dictate that Plaintiffs cannot recover the remediation costs paid for by their insurance policies. Likewise, Plaintiffs' state law claims for contribution and indemnity also fail.

Plaintiffs contend that they expended $839,244 for remediation costs for soils and $51,624 for remediation costs for groundwater characterization before the inception of the insurance policies. There is insufficient evidence for the Court to determine the allocation of those costs. Thus, the allocation of pre-insurance response costs incurred by Plaintiffs, totaling $890,868, must be decided at trial.

**C. Declaratory Relief**

■ Section 113(g)(2) of CERCLA provides that "[i]n any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). Atlantic Richfield claims that declaratory relief is inappropriate here because the entirety of response costs are unknown and there is

insufficient evidence supporting Plaintiffs' claim for relief. Plaintiffs argue that they can assert a claim for declaratory relief under CERCLA even if those response costs have not yet been incurred, and that the Court should allow evidence at trial on the declaratory relief claim. Declaratory relief is inappropriate here because total response costs for the cleanup are speculative.

### CONCLUSION

For the reasons explained above, Defendants Atlantic Richfield and the United States are responsible parties under CERCLA for hazardous wastes disposed of at the BMI Complex. Atlantic Richfield is directly liable as an operator and arranger. The United States is directly liable as an owner and arranger. The United States' liability as an operator will be determined at trial. Although Plaintiffs has set forth cost recovery and contribution claims under CERCLA §§ 107 and 113, Plaintiffs are barred from recovering any costs covered by and paid for under their insurance policies. Plaintiffs' pre-insurance costs totaling $890,868 may be recoverable. Defendants' proportionate share of liability for those pre-insurance costs will be allocated at trial. Declaratory relief is not appropriate at this time.

IT IS THEREFORE ORDERED that:

(1) Defendant Atlantic Richfield Company's Motion for Summary Judgment on Direct Liability (# 218) is GRANTED in part and DENIED in part.

(2) Defendant Atlantic Richfield Company's Motion for Summary Judgment on Alter Ego Liability (# 219) is GRANTED.

(3) Plaintiffs' Motion for Partial Summary Judgment for Atlantic Richfield's Liability as a Responsible Party Under CERCLA (# 237) is GRANTED in part and DENIED in part.

(4) Plaintiffs' Motion for Summary Judgment for United States' Liability as a Responsible Party Under CERCLA (# 280) is GRANTED in part and DENIED in part.

(5) Defendant United States' Motion for Summary Judgment (SEALED) (# 312) is GRANTED in part and DENIED in part.

(6) Defendant Atlantic Richfield Company's Motion for Summary Judgment on Relief Sought by Plaintiffs (SEALED) (# 314) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Plaintiffs' Renewed Motion in Limine to Exclude Evidence of Environmental Insurance Policies and Environmental Insurance Payments Plaintiffs Received (SEALED) (# 458) and Plaintiffs' Request for Hearing on Renewed Motion in Limine to Exclude Evidence of Environmental Insurance Policies and Environmental Insurance Payments Plaintiffs Received (# 461) are DENIED. The hearing set for March 17, 2008, is hereby VACATED.