UNITED STATES of America, and California Department of Toxic Substances Control, Plaintiffs,

v.

STERLING CENTRECORP INC., Stephen P. Elder and Elder Development, Inc., Defendants.

No. 2:08–cv–02556–MCE–JFM.

United States District Court, E.D. California.

June 24, 2013.

Patricia Lyn Hurst, Paul Cirino, Amy R. Gillespie, Esperanza Anderson, Gabriel M. Allen, Karl John Fingerhood, U.S. Department of Justice, Washington, DC, Jamie Jefferson, California Attorney General's Office, Oakland, CA, Kirk McInnis, Attorney General's Office of the State of California, Oakland, CA, for Plaintiffs.

Stephen P. Elder, Nevada City, CA, pro se.

## CONCLUSIONS OF LAW

MORRISON C. ENGLAND, JR., Chief Judge.

### I. THE ELEMENTS OF CERCLA LIABILITY [1]

1. This Court has previously held that in order to establish liability for response costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Plaintiffs must make a four-part showing. First, Plaintiffs must prove that the Site is a "facility" as defined by CERCLA. Second, they must show that a "release" or "threatened release" of a hazardous substance from the facility has occurred. Third, Plaintiffs must establish that the release or threatened release caused Plaintiffs to incur response costs. Fourth and finally, a defendant must fall within one of the four classes of covered persons described in Section 107(a). *Cose v. Getty Oil Co.*, 4 F.3d 700, 703–04 (9th Cir.1993); *3550 Stevens Creek Assocs. v. Barclays Bank of California*, 915 F.2d 1355, 1358 (9th Cir.1990). Docket Entry ("DE") 154 at 9:14–26, ·2011 WL 6749801 (Memorandum and Order, 12/22/2011).

2. Among the four classes of covered persons described in Section 107(a) is "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of...." 42 U.S.C. § 9607(a)(2).

3. This Court has previously determined that (1) the Lava Cap Site is a facility; (2) that arsenic is a hazardous substance; (3) that there were releases of arsenic at and from the Site; and (4) that the Plaintiffs have incurred response costs responding to those releases. DE 152, 2011 WL 6130887 (Memorandum and Order, 12/8/2011); *see* DE 154 at 10:9–16 (Memorandum and Order, 12/22/2011).

4. The remaining issues for decision are Sterling's status as a covered person under Section 107(a) of CERCLA, and this Court's *in personam* jurisdiction over Sterling.

5. Under Section 101(21) of CERCLA, the definition of "person" includes a "corporation." 42 U.S.C. § 9601(21); *American Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 n. 8 (9th Cir.1996). The Court

---

1. "To the extent that any of the Findings of Facts may be deemed Conclusions of Law, they also shall be considered conclusions. Likewise, to the extent that any of the Conclusions of Law may be deemed Findings of Fact, they shall be considered findings." *United States v. Newmont USA Limited and Dawn Mining Co.*, No. CV–05–020–JLQ, 2008 WL 4621566 at *2 n. 1 (E.D.Wash. Oct. 17, 2008), citing *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985) (noting the difficulty, at times, of distinguishing findings of facts from conclusions of law).

concludes, as an initial matter, that Sterling is a person under Section 101(21) of CERCLA because it is a corporation.

6. As discussed below, the Court concludes that (a) Sterling expressly and impliedly assumed the liabilities of former owner/operator Lava Cap Gold Mining Corporation ("LCGMC"); (b) that Sterling is the successor to LCGMC by *de facto* merger; and (c) that Sterling operated the Lava Cap Mine at the time of a disposal of a hazardous substance. Any one of these three conclusions alone satisfies CERCLA liability. This Court further concludes that it has jurisdiction over Sterling based on its status as LCGMC's successor, and based on its direct operation of the Lava Cap Mine. Either of these two conclusions alone is sufficient for the Court's exercise of jurisdiction over Sterling.

## II. STERLING'S EXPRESS AND IMPLIED ASSUMPTION OF LCGMC'S LIABILITIES

7. This Court has previously held that the Ninth Circuit recognizes that corporate successors should answer for the liabilities of their predecessor corporations under CERCLA. *See Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1262 (9th Cir.1990) ("Congress did intend successor liability" under CERCLA), *overruled on other grounds, Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 132 F.3d 1295, 1301, *amended and superseded by* 159 F.3d 358, 364 (9th Cir. 1997). DE 154, at 10:19–26.

8. This Court has previously held that, in addition, other courts have uniformly concluded that successor corporations are within the meaning of "persons" for purposes of CERCLA liability. *See United States v. Mexico Feed and Seed Co., Inc.*, 980 F.2d 478, 486–87 (8th Cir.1992); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837 (4th Cir.1992); *Anspec Co., Inc. v. Johnson Controls, Inc.*, 922 F.2d

1240, 1245–48 (6th Cir.1991); *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91–92 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). DE 154, at 11:1–9.

9. This Court has previously held that the Ninth Circuit has not squarely addressed whether federal or state law governs when determining successor liability under CERCLA. *Atchison*, 159 F.3d at 362–64 (stepping back from a prior unequivocal announcement as to the applicability of state law, on grounds that the court "need not determine" whether state law is dispositive since both state law and federal common law yield the same result). DE 154, at 12:8–16.

10. This Court has previously held that, under both Ninth Circuit precedent and California law, successor liability does not arise from an asset purchase "unless (1) the purchasing corporation expressly or impliedly agrees to assume the liability; (2) the transaction amounts to a 'de-facto' consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction was fraudulently entered into in order to escape liability." *Atchison*, 159 F.3d at 361; *Ray v. Alad Corp.*, 19 Cal.3d 22, 28, 136 Cal.Rptr. 574, 560 P.2d 3 (Cal.1977). As the quoted language makes clear, successor liability can rest on any one of these four variants. DE 154, at 10:11–21.

11. This Court has previously held that parol evidence is admissible to show all circumstances surrounding a transaction in order to determine the meaning intended and understood by the parties. *See Brookes v. Adolph's Ltd.*, 170 Cal.App.2d 740, 746, 339 P.2d 879 (Cal.App. 2 Dist. 1959); *see also* Cal. Civ.Code § 1647 ("A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"). DE 154, at 14:24–15:4.

■ 12. Successor liability exists when the parties have, through agreements, words, or conduct, indicated their intent to shift liability from one party to another. *Fisher v. Allis–Chalmers Corp. Product Liability Trust,* 95 Cal.App.4th 1182, 1192–93, 116 Cal.Rptr.2d 310 (Cal.App. 5 Dist.2002); *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal.App.4th 445, 474, 80 Cal.Rptr.2d 329 (Cal.App. 1 Dist.1998) ("The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent acts and conduct of the parties."). *See also Florom v. Elliott Mfg.,* 867 F.2d 570, 576, *reh'g denied,* 879 F.2d 801 (10th Cir.1989) (holding that material factual issues remained regarding successor liability, preventing summary judgment for the purchaser, because the parties' agreement did not expressly exclude successor tort or product liability, and the purchaser had maintained product liability insurance coverage); *Ambrose v. Southworth Products Corp.,* 953 F.Supp. 728, 736 (W.D.Va.1997) (holding that a letter taking responsibility for product defects and other conduct and circumstances "suggest[ed] that an implied agreement may have existed," transferring liability).

■ 13. A contracting party's assumption of liabilities may be express, implied, or both. *Atchison,* 159 F.3d at 361; *Ray,* 19 Cal.3d at 28, 136 Cal.Rptr. 574, 560 P.2d 3. As discussed below, the Court concludes that Sterling expressly and impliedly assumed LCGMC's liabilities.

## A. Sterling's Express Assumption of LCGMC's Liabilities

■ 14. The analysis of whether a contracting party has expressly assumed the liabilities of a seller begins by construing the parties' written agreements. *Schwartz v. Pillsbury Inc.,* 969 F.2d 840, 845–46 (9th Cir.1992); *Gee v. Tenneco, Inc.,* 615 F.2d 857, 862 (9th Cir.1980); *United States v. Iron Mountain Mines, Inc.,* 987 F.Supp. 1233 (E.D.Cal.1997); *Universal Sales Corp. v. California Press Mfg. Co.,* 20 Cal.2d 751, 760, 128 P.2d 665 (Cal.1942). But courts also routinely look beyond the parties' agreements to consider all relevant circumstances. In *Warner Construction Corp. v. City of Los Angeles,* 2 Cal.3d 285, 296–97, 85 Cal.Rptr. 444, 466 P.2d 996 (Cal.1970), the California Supreme Court stated that "[t]he construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court." *Accord Western Med. Enter., Inc. v. Albers,* 166 Cal.App.3d 383, 391, 212 Cal.Rptr. 434 (Cal.App. 1 Dist. 1985); *Zito v. Firemen's Insur. Co.,* 36 Cal.App.3d 277, 284–85, 111 Cal.Rptr. 392 (Cal.App. 4 Dist.1973); *Schmidt v. Macco Construction Co.,* 119 Cal.App.2d 717, 732, 260 P.2d 230 (Cal.App. 1 Dist.1953); *Bartel v. Assoc. Dental Supply Co.,* 114 Cal. App.2d 750, 753–54, 251 P.2d 16 (Cal.App. 1 Dist.1952).

■ 15. "The acts of the parties under the contract afford one of the most reliable means of arriving at their intention." *Wolf v. Walt Disney Pictures & Television,* 162 Cal.App.4th 1107, 1134, 76 Cal.Rptr.3d 585 (Cal.App. 2 Dist.2008); *see also Spinks v. Equity Residential Briarwood Apts.,* 171 Cal.App.4th 1004, 1024, 90 Cal.Rptr.3d 453 (Cal.App. 6 Dist.2009) (the parties "practical construction of a contract, as shown

by their actions, is important evidence of their intent"); *Cedars–Sinai Med. Ctr. v. Shewry*, 137 Cal.App.4th 964, 983, 41 Cal. Rptr.3d 48 (Cal.App. 2 Dist.2006) (the parties' conduct subsequent to the formation of the contract may be looked upon "for they are probably least likely to be mistaken as to the intent").

16. Courts have universally held that "language transferring 'all liabilities' is sufficiently broad to include environmental liabilities," including liability under laws enacted after the operative contract. *Iron Mountain Mines*, 987 F.Supp. at 1241; *see Jones–Hamilton Co. v. Beazer Materials & Services, Inc.*, 973 F.2d 688, 693 (9th Cir.1992) (finding that a 1970 indemnification clause included after-arising CERCLA environmental liability); *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 309–10 (3d Cir.1985) (CERCLA liabilities included in "all debts, obligations and liabilities"); *HRW Sys., Inc. v. Washington Gas Light Co.*, 823 F.Supp. 318, 332–33 (D.Md.1993) ("all liabilities and obligations, liquidated or unliquidated" includes after-arising liabilities); *see also Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 15–16 (2d Cir.1993) ("all liabilities (absolute or contingent)"); *Purolator Prods. Corp. v. Allied–Signal, Inc.*, 772 F.Supp. 124, 131–32 (W.D.N.Y.1991) (finding the parties intended transfer where indemnification agreement referred to "all liabilities").

17. Sterling argues based on these cases that the word "all" must appear before the word "liabilities" in order to conclude that all liabilities have been transferred under an agreement. The Court disagrees. These cases do not stand for the proposition that the word "all" is a prerequisite for a finding of broad assumption of liabilities, as Sterling contends. Rather, they suggest that use of the word "all" to describe the liabilities assumed is one indicator of the parties' mutual intention to transfer broad liabilities. It is not the only indicator.

18. Rather, prevailing case law suggests that the parties' intentions should be determined based on all of the circumstances surrounding the transaction. The Court notes that one court imposed successor liability under CERCLA based on an express assumption of liabilities where the parties represented that the buyer had agreed to purchase "substantially all of the assets and liabilities" of the seller. *See Ashley II of Charleston, L.L.C. v. PCS Nitrogen, Inc.*, No. 2:05–2782–CWH, 2007 WL 2893372 at *7 n. 10 (D.S.C. Sept. 28, 2007). Courts have even considered whether the agreement explicitly states that the parties did *not* intend the assumption of certain liabilities. In *Philadelphia Elec. Co. v. Hercules, Inc.*, for example, the court concluded that the defendant's "assumption of liability did not *exclude* liabilities that were unknown or contingent," in contrast to cases in which "clear and specific language ... [was] used to effect the exclusion of unknown or contingent liabilities." *Philadelphia Elec. Co.*, 762 F.2d at 309–10 (emphasis added) (reasoning that when a party transfers liabilities except for certain listed exceptions, "it is of no consequence that the specific liability at issue is not enumerated.... Unless this liability comes within one of the express exceptions, [the defendant] may be held to have assumed it.").

19. This Court concludes that Sterling expressly assumed all the liabilities of LCGMC, including its CERCLA liability. As discussed in Findings 28–30, Sterling acquired all of the assets of LCGMC "subject to its liabilities." Sterling's assumption of liabilities is broad and unfettered. The 1952 Agreement with LCGMC does not exclude any liability from those assumed by Sterling, and does not reserve any liability to LCGMC.

Where specific liabilities are mentioned, the 1952 Agreement is inclusive, not exclusive. Sterling agreed, for example, to assume all the expenses of LCGMC, "including" the obligation to cause the dissolution of LCGMC and the distribution to LCGMC stockholders of Sterling stock.

20. The parol evidence also indicates that the parties intended to transfer broad liabilities to Sterling under the 1952 Agreement. As discussed in Findings 47–54, both parties represented to their shareholders that Sterling would assume broad liabilities and Sterling represented to Chase Manhattan Bank that it had indeed assumed all of LCGMC's liabilities when it sought access to funds in LCGMC's name. All three of these letters are significant admissions of senior officers of both contracting parties. *See Ladjevardian v. Laidlaw–Coggeshall, Inc.*, 431 F.Supp. 834, 839–40 (S.D.N.Y.1977) (noting the importance of "[a]dmissions of liability on the part of officers or other spokesmen of the successor corporation" as a factor in determining whether a party has impliedly assumed liability). They express a clear and mutual intent to transfer all liabilities to Sterling.

21. Sterling argues that it assumed only those liabilities of which it was advised, and that it could not have been advised of LCGMC's CERCLA liability because CERCLA was not yet enacted. The Court finds this interpretation of the 1952 Agreement unnecessarily restrictive. Sterling relies on a "Whereas clause" in the Agreement, in which the parties represent that Sterling "has made an inspection by its representatives of the physical assets of [LCGMC] and has been duly advised as to the other assets and liabilities of [LCGMC]." *See* Finding 32. This language does not restrict the scope of Sterling's assumption in any way. It merely notes that Sterling has conducted its due diligence, and that LCGMC has disclosed its liabilities to Sterling. Even if Sterling's interpretation of the 1952 Agreement prevailed, as discussed in Findings 33–40, Sterling was constructively advised and was on notice of both the mine waste and the environmental liability it posed prior to the closing of the 1952 Agreement.

## B. Sterling's Implied Assumption of LCGMC's Liabilities

22. Even where there has been no express assumption of liabilities, an implied assumption may still be found. In *Carter v. CMTA–Molders & Allied Workers Health & Welfare Trust*, for example, the court considered whether the defendant had impliedly assumed agreements its predecessor had made with a third party. 563 F.Supp. 244, 247 (N.D.Cal. 1983), *aff'd*, 736 F.2d 1310 (9th Cir.1984). Only after considering whether the purchaser was aware of these agreements, whether the contracting parties discussed them, and the fact that the defendant had refused to execute new agreements with the third party did the court conclude that the defendant had not assumed the seller's agreements. *Id. See also SCM Corp. v. Berkel, Inc.*, 73 Cal.App.3d 49, 58–59, 140 Cal.Rptr. 559 (Cal.App. 5 Dist.1977) (holding that, although the parties' agreement transferring liability took place before the adoption of strict product liability in California, it appeared from the facts "that the parties intended the burden of liability for injuries ... to fall entirely on [the successor's] shoulders," and the parties' intent was determinative: "it should not be necessary to look for unusually clear, express language in order to find a provision transferring tort liability in the sale of a business"); *Ambrose*, 953 F.Supp. at 736 (holding that although there was no express assumption of liabilities in the form of an agreement between the parties, the plaintiff had established a material factual issue

as to the existence of an implied assumption).

23. Courts have emphasized that an implied assumption of liabilities is like an express assumption, an agreement between parties with the intent of transferring liability; it "may be inferred from the conduct, situation or mutual relation of the parties" outside the parties' official agreement. *Truck Ins. Exch. v. Amoco Corp.,* 35 Cal.App.4th 814, 824–25, 41 Cal.Rptr.2d 551 (Cal.App. 2 Dist.1995) (internal citations omitted). *See also Antiphon, Inc. v. LEP Transport, Inc.,* 183 Mich.App. 377, 384–85, 454 N.W.2d 222 (Mich.App.1990) (holding that the successor's "conduct and representations" indicating an intent to assume liability were sufficient to imply the existence of an assumption of liabilities); *cf.* Cal. Civ.Code § 1621 (an implied contract is one in which its "existence and terms ... are manifested by conduct").

24. Whether a party has impliedly assumed the liabilities of another "depends on the facts and circumstances of each case" and the parties' conduct and representations. *Ladjevardian,* 431 F.Supp. at 839–40 (weighing "the effect of the transfer [of liabilities] upon creditors of the predecessor corporation" and "[a]dmissions of liability on the part of officers or other spokesmen of the successor corporation" to note that "the facts do suggest that there may have been an implied assumption of liability"). *See also Asarco,* 909 F.2d at 1264 ("The question of implied assumption of liability is a fact specific question, rather than a purely legal issue," and addressing it on appeal would require "additional facts ... to be developed"); *Antiphon,* 183 Mich.App. 377, 454 N.W.2d 222 ("Whether such an intent [to assume liability] exists must be determined from the facts and circumstances of each case.").

25. Sterling's broad assumption of LCGMC's liabilities may reasonably be implied from the circumstances surrounding the transaction. As discussed in Findings 24–30, Sterling took control of the entirety of LCGMC's business, which other courts have found significant. *See Iron Mountain Mines,* 987 F.Supp. at· 1243 (noting that the fact that the acquiring company took control of every aspect of the mining company's operation suggested that the acquiring company intended to assume all of the mining company's liabilities).

26. As discussed in Findings 55–57, LCGMC assigned all of its insurance policies to Sterling. The Court infers from this assignment that LCGMC did not anticipate any further need for coverage from losses of any kind.

27. Moreover, LCGMC directors and shareholders approved the dissolution of their company. The Court concludes that this is further evidence of the parties' mutual intention to transfer all liabilities to Sterling. LCGMC was a Delaware corporation and, in 1952, the extent of personal liability of Delaware directors and shareholders of dissolved corporations was unresolved. One Delaware court commenting on the relevant statutory scheme noted that it "still leaves open the question, what, if any, rights are afforded to persons who have no claim against a corporation at the time of its dissolution, or during the statutory windup period, but who do thereafter acquire such a claim." *In re RegO Co.,* 623 A.2d 92, 96 (Del.Ch.1992). The court was troubled, for example, by the open question of whether a tort claimant injured by an arguably defective product "perhaps years after" the corporation had been dissolved could bring a cognizable claim against directors and shareholders of the dissolved entity. *Id.* ("This I take to be an unclear and troubling question."). It noted that, "in this state of affairs, the question of a dissolving corporation's duty, if any, to potential future claimants is problematic in at least two ways." *Id.* First,

"the problem of compensation to persons injured by defective products *or by undiscovered and actionable environmental injury*, caused by dissolved corporations, is of obvious social concern." *Id.* (emphasis added). And second, the unsettled state of the law gave corporate directors *"insufficient comfort* to permit them safely to make a final distribution, if they have reason to know that future claims are quite likely to arise." *Id.* (emphasis added).

28. Sterling cites to *In re Citadel Industries, Inc.*, 423 A.2d 500 (Del.Ch.1980) in support of its argument that LCGMC's directors were not potentially liable for claims brought against the dissolved corporation. The Court concludes that the case is inapposite. *Citadel* addressed the potential liability of the dissolved corporation, not of the individual corporate directors. And it addressed the state of the law fifteen years after the corporation dissolved, not at the time of dissolution.

29. The Court concludes that in 1952 there was a significant risk of personal liability for LCGMC's directors and shareholders in the event claims arose against LCGMC after dissolution. In light of this risk, the directors and shareholders of LCGMC can only have understood that the company had transferred all liabilities to Sterling under the 1952 Agreement when they approved LCGMC's dissolution. *See Iron Mountain Mines*, 987 F.Supp. at 1243.

30. As discussed in Findings 65–72, Sterling's conduct is also consistent with its intention to acquire all of LCGMC's liabilities. Sterling took full responsibility for workers compensation claims brought by former LCGMC miners. Sterling never refused to pay a claim on the ground it was unknown, and there is no evidence that Sterling ever referred a claim to the former directors or shareholders of LCGMC for payment. To the contrary, the evidence shows Sterling paid out more

than $100,000 in claims, and that it continued to resolve claims as late as 1985. It used all of the bond money it had acquired from LCGMC and, when that ran out, it used its own funds to resolve the claims. The Court concludes that Sterling's conduct with respect to these claims demonstrates its intention to assume all liabilities of LCGMC, known and unknown.

31. This Court concludes, based on the language of the 1952 Agreement, and all the facts and circumstances surrounding the transaction, that Sterling expressly and impliedly assumed all LCGMC's liabilities, including its CERCLA liability.

## C. A Clear Intention to Transfer Broad Liabilities Is All That Is Needed to Transfer CERCLA Liability

32. Sterling asserts that, for contracting parties to transfer liability under statutes enacted after a transaction occurs, the parties must clearly state their intention to do so in the agreement itself. The Court concludes that no such requirement exists for a transfer of CERCLA liabilities based on a review of the pertinent case law discussed below.

33. CERCLA liability has been held to have been transferred under agreements made prior to its enactment. In *United States v. Iron Mountain Mines, Inc.*, the court held that the purchasing corporation had expressly assumed CERCLA liability as part of its agreements with the seller, even though CERCLA was enacted years after the agreements had been signed. *Iron Mountain Mines*, 987 F.Supp. at 1243.

34. Numerous other courts have also recognized CERCLA liability retroactively in pre-CERCLA agreements. *See, e.g., Olin*, 5 F.3d at 15–16 (holding that the parties did intend to indemnify for CERCLA liability in an agreement made before

CERCLA's enactment); *Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3rd Cir. 1994) (reasoning that "[o]ther courts that have analyzed pre-CERCLA indemnity provisions have uniformly held that a pre-CERCLA agreement can require one party to indemnify another against CERCLA liability" and holding that a pre-CERCLA agreement can trigger CERCLA liability); *Philadelphia Elec. Co.*, 762 F.2d at 309–10 (holding that the language of liability assumption was broad enough to include contingent and unknown liabilities); *Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 327 (7th Cir.1994) ("A party may indemnify another party for liability arising out of a law not in existence at the time of contracting," including CERCLA liability); *Purolator Prods.*, 772 F.Supp. at 131–32 (reasoning that pre-CERCLA agreements with "broad, inclusive wording" on liability can still be applied to CERCLA claims).

35. California courts have found parties to have assumed liability under after-enacted statutes. For example, in *SCM Corp. v. Berkel, Inc.*, a tort case, the defendant and its predecessor had agreed to transfer liabilities in an agreement made before the state adopted the doctrine of strict product liability. 73 Cal.App.3d at 59, 140 Cal.Rptr. 559. The court nonetheless held that the defendant was strictly liable for the plaintiff's injury as a successor, since it appeared from the evidence "that the parties intended the burden of liability for injuries" to be transferred to the defendant. *Id.* at 58, 140 Cal.Rptr. 559. The court held that "although principles of contract law should apply and the intention of the parties should be determinative, it should not be necessary to look for unusually clear, express language in order to find a provision transferring tort liability in the sale of a business.... The question is one of contract interpretation, and we should use a pragmatic approach." *Id.*

36. In other contexts, California courts have held that contracts may be "deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws for the public good and in pursuance of public policy." *In re Marriage of Walton*, 28 Cal.App.3d 108, 112, 104 Cal.Rptr. 472 (Cal.App. 4 Dist.1972) (holding that a statutory change in the grounds for divorce was not an unconstitutional impairment of the right to contract). Thus, "not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order." *People v. Gipson*, 117 Cal.App.4th 1065, 1069, 12 Cal.Rptr.3d 478 (Cal.App. 6 Dist.2004) (holding that the defendant's plea bargain contemplated the power of the state to amend the law and incorporated subsequent changes in the law enacted in pursuit of the public good).

37. This Court in its December 22, 2011 Order (DE 154) indicated that "under California law, laws enacted after a contract was formed can still become part of an assumption of liabilities," but in dicta noted that *Swenson v. File* appears to require "clear and distinct" evidence that a broad assumption was in fact contemplated by the parties. DE 154 at 12:25–26. The "clear and distinct" standard that the Court attributed to *Swenson* is not in fact specified in that opinion. *See Swenson v. File*, 3 Cal.3d 389, 90 Cal.Rptr. 580, 475 P.2d 852 (Cal.1970). Instead, the *Swenson* court notes that "laws enacted subsequent to the execution of an agreement are not ordinarily deemed to become part of the agreement unless its language clearly indicates this to have been the intention of the parties." *Id.* at 393, 90 Cal.Rptr. 580, 475 P.2d 852. Thus, the *Swenson* court did not set a "clear and distinct" standard, but

looked to the parties' intent to determine the meaning of the agreement, as other courts have. *Id.* To the extent the Court's December 22, 2011 Order indicated otherwise, that finding was in error and the correct standard is set forth herein.

38. At least one federal court has determined that the rule applied in *Swenson,* preventing laws enacted after a contract was formed from becoming part of the contract unless there is a clear statement to the contrary, "ought not be applied to CERCLA liability." *Iron Mountain Mines, Inc.,* 987 F.Supp. at 1243. The *Iron Mountain Mines* court found the language of the parties' agreement broad enough to encompass CERCLA liability, although it was silent as to after-enacted liability. *Id.* at 1242.

39. Reading *Swenson* to require courts to look for "clear and distinct" evidence in the parties' written agreements would conflict with well-established state law encouraging courts to examine parol evidence, which this Court previously held to be "admissible to show all circumstances surrounding a transaction in order to determine the meaning intended and understood by the parties." DE 154, at 14:24–26. *See, e.g., Brookes,* 170 Cal.App.2d at 746, 339 P.2d 879; Cal. Civ.Code § 1647 ("a contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"). It would also appear to conflict with other California cases holding that the intentions of the parties are determinative, and that it "should not be necessary to look for unusually clear, express language" to determine that intent. *See, e.g., SCM Corp.,* 73 Cal.App.3d at 58, 140 Cal.Rptr. 559. These reasons, and those discussed in *Iron Mountain Mines,* such as CERCLA's broad purpose and clear retroactivity, compel the conclusion that *Swenson v. File* "ought not be applied to CERCLA liability." *Iron Mountain Mines, Inc.,* 987

F.Supp. at 1242–43 (finding the language of the parties' agreement broad enough to encompass CERCLA liability, although it did not mention after-enacted liability specifically).

40. This Court adopts the interpretation of the requirements for an express or implied assumption of after-enacted CERCLA liability in *Iron Mountain Mines* as the correct one, and holds that after-enacted CERCLA liability can be assumed if all the available evidence, including parol evidence, suggests that a broad assumption was in fact contemplated by the parties.

## III. LCGMC'S *DE FACTO* MERGER WITH STERLING

41. The doctrine of *de facto* merger is an equitable doctrine that recognizes that successor liability may attach "where one corporation is absorbed by another, but without compliance with the statutory requirements for a merger." *Iron Mountain Mines,* 987 F.Supp. at 1243 n. 19 (citations omitted).

42. California law recognizes that "[a] transaction cast in the form of an asset sale [which] actually achieves the same practical result as a merger will be treated as a merger." *Marks v. Minnesota Mining and Mfg. Co.,* 187 Cal.App.3d 1429, 1435, 232 Cal.Rptr. 594 (Cal.App. 1 Dist.1986). The buyer corporation assumes the liabilities, known and unknown, of the seller corporation. *Id.*

43. When a *de facto* merger is alleged, the court must determine "the substance of the agreement [regardless of] the title put on it by the parties." *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution,* 712 F.Supp. 1010 (D.Mass.1989) (citations omitted). Courts typically consider the following factors in determining whether

to characterize an asset purchase as a *de facto* merger:

(1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation. *See, e.g., Philadelphia Elec. Co.*, 762 F.2d at 310.

44. Courts have held that "[n]o one of these factors is either necessary or sufficient to establish a *de facto* merger." *Acushnet River*, 712 F.Supp. at 1015 (citations omitted). *See also Atlas Tool Co., Inc. v. Commissioner of Internal Revenue*, 614 F.2d 860, 870 (3d Cir.1980) ("[E]very factor is not essential for applying the [de facto merger] doctrine."); *Menacho v. Adamson United Co.*, 420 F.Supp. 128, 133 (D.N.J.1976) ("Not all of these factors are needed to demonstrate a merger; rather, these factors are only indicators that tend to show a *de facto* merger."); *Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529, 1535 (S.D.N.Y.1985).

45. Those courts that have assigned weight to individual factors in evaluating whether a *de facto* merger has occurred typically view continuity of shareholders (not continuation of the seller's enterprise)

as the most important of the factors supporting a *de facto* merger. *See Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d at 1265 ("Because there is no genuine issue of material fact as to continuity of shareholders, the district court did not err in finding that the asset purchase was not a *de facto* merger."). The Eleventh Circuit opined, for example, in *Bud Antle, Inc. v. Eastern Foods, Inc.*, that:

> [a]t the very least, there must be some sort of continuation of the stockholders' ownership interests.... The reason for this requirement is that corporate liability adheres not to the nature of the business enterprise but to the corporate entity itself.... Even if the corporation sells to another corporation its entire business operation and all its assets, in exchange for some consideration other than stock, the two corporate entities remain distinct and intact.
>
> The corporate entities have not merged, and each is liable for its own debts.... Where the assets are sold for cash [rather than stock], no basic fundamental change occurs in the relationship of the stockholders to their respective corporations, ... and absent continuity of shareholder interest, the two corporations are strangers, both before and after the sale.

758 F.2d 1451, 1458 (11th Cir.1985) (citations omitted). *See also Dayton v. Peck, Stow and Wilcox Co. (Pexto)*, 739 F.2d 690, 693 (1st Cir.1984) (continuity of shareholders is "[o]ne of the key requirements for a merger," because "the shareholders of the seller corporation become a constituent part of the purchaser corporation"); *Atlas Tool Co.*, 614 F.2d at 871 (noting that "continuity is the basis and test" for the *de facto* merger exception and that continuity existed in, among other things, "continuation of stockholder interest").

46. Unlike other theories of successor liability, the *de facto* merger doctrine is a judge-made rule that "rests on general equitable principles." *Acushnet River*, 712 F.Supp. at 1015 (citations omitted). "The question of whether a transferee of assets is liable for the debts and liabilities of the transferor ... must ultimately be decided by weighing the 'policy protecting corporate creditors ... against the equally important policy respecting separate corporate entities.'" *Shannon v. Samuel Langston Co.*, 379 F.Supp. 797, 802 (W.D.Mich.1974) (internal quotes omitted). The better-reasoned decisions turn on the need for fairness, and conduct a holistic inquiry rather than a rote factor-by-factor analysis. For example, the court in *Marks* focused on whether "an asset sale actually achieves the same practical result as a merger," and concluded that a *de facto* merger had occurred because "the result of the transaction was exactly that which would have occurred had a statutory merger taken place, and we are accordingly convinced of the necessity and the fairness of transferring liability." *Marks*, 187 Cal.App.3d at 1436–37, 232 Cal.Rptr. 594.

47. This Court has previously found that determining whether there is a continuity of enterprise is a fact-intensive inquiry necessary to ensure that "solvent corporations, going concerns, should not be permitted to discharge their liabilities to injured persons simply by shuffling paper and manipulating corporate entities." DE 154, at 17:7–12 (quoting *Marks v. Minnesota Mining and Mfg. Co.*, 187 Cal. App.3d 1429, 1437, 232 Cal.Rptr. 594 (Cal. App. 1 Dist.1986) (internal citation omitted)).

48. This Court concludes, on all the evidence presented, that the 1952 transaction had all of the indicia of a *de facto* merger. The facts compel the conclusion that Sterling was not merely acquiring LCGMC's assets, but rather that LCGMC was being merged with and absorbed into Sterling.

49. The Court concludes that there was a continuity of shareholders. As discussed in Findings 75–76, LCGMC's shareholders were absorbed as Sterling's shareholders.

50. The Court concludes that the seller corporation ceased its ordinary business operations and promptly dissolved. As discussed in Finding 77, LCGMC dissolved soon after the transaction was completed.

51. The Court concludes that the purchasing corporation assumed the seller's obligations necessary for continuation of its business operations. As discussed in Findings 78–79, Sterling assumed the tax, payroll, insurance, and other expenses, including responsibility for resolving workers' compensation claims.

52. The Court concludes that there was a continuation of the enterprise of the seller corporation, including continuity of management, personnel, physical location, assets, and general business operations, as discussed in Findings 81–87. Based on the evidence discussed in Findings 89–91, the Court concludes that LCGMC's business operations in 1952 consisted of holding the Mine for future reopening, and searching for parties with the interest and wherewithal to return the Mine to production.

53. This Court further concludes, based on the evidence discussed in Findings 88–139, that Sterling also wished to return the Mine to production, and that for decades it sought partnerships with other mining enterprises to reopen the Mine. LCGMC employees continued to work at the Mine, indicating continuity of personnel. Sterling added two former LCGMC officials to its own board to provide representation for the former LCGMC shareholders, indicating continuity of manage-

ment. Sterling acquired all the assets of LCGMC and decided to preserve some equipment for future mining operations, and to dispose of surplus equipment in California. The Court concludes that these facts establish a complete continuity of assets and location. And, based on the evidence, the Court concludes that Sterling continued the general business operations of LCGMC. Sterling repeatedly commissioned profitability studies for the Lava Cap Mine, it adopted and maintained a policy of holding sufficient equipment and property rights to resume mining and, for decades, it actively courted business partners in an effort to return the mine to production.

54. Sterling argues that it did not acquire LCGMC's assets with the intent of resuming production there. Rather, it argues, its sole objective was to acquire the surface plant for use at its mine in Duvernay, Quebec. As discussed in Findings 92–124, the Court rejects this interpretation of the evidence and finds that Sterling did intend to reopen the Lava Cap Mine, if not from the outset, then, shortly after it acquired the Mine in 1952. Sterling has presented no case requiring or even suggesting that the intent of the purchaser prior to the acquisition is the appropriate inquiry. The Court concludes that continuity of the general business operations of the seller is best determined based on what the surviving company actually did with the assets of the seller, not what it considered doing with them prior to the acquisition.

55. Sterling also argues that it did not continue the operations of LCGMC because it sought and entertained offers to purchase the Mine over the course of its 37–year association with the Mine. Again, Sterling has presented the Court with no case law in support of its argument. The Court concludes that the law of de facto merger does not require that the surviving company rigidly adhere to the business objectives of the seller. Even if that were a requirement of law, the Court concludes that Sterling's willingness to sell the Mine if offered a sufficiently high price is consistent with its business objectives, and LCGMC's business objectives, as an owner of a potentially valuable gold mine.

56. An additional factor supporting a de facto merger is that the parties did in fact treat the transaction as a merger for tax purposes, see Findings 137–139, a factor that other courts have relied on to determine that an asset purchase was a de facto merger. Marks, 187 Cal.App.3d at 1430 n. 2 & 1436 n. 14, 232 Cal.Rptr. 594; Acushnet, 712 F.Supp. at 1018 (noting that tax treatment of a transaction may also support a finding of de facto merger).

57. Based on the evidence, the Court concludes that Sterling absorbed LCGMC in a de facto merger. See Iron Mountain Mines, 987 F.Supp. at 1242 ("[The purchasing corporation] did not purchase a component of [the seller's] business or a portion of its assets. Rather, through its acquisition of all of [the seller's] stock and the dissolution of the corporation, [the purchaser] absorbed all of [the seller] into itself.").

58. The Court further concludes that the equities of treating Sterling's acquisition as a de facto merger are clear. Sterling should pay for the costs of the arsenic cleanup at the Lava Cap Mine rather than federal and state taxpayers, because it absorbed LCGMC, the entity that created the mine waste that resulted in the pollution. See Marks, 187 Cal.App.3d at 1433, 1437, 232 Cal.Rptr. 594 (reasoning that "all of the indicia of a de facto merger [were] present" where the predecessor corporation received shares of the successor corporation's stock in exchange for all its assets and dissolved "as soon as practicable" following the Agreement; despite "the

disclaimer of liability for 'unknown claims,'" the court was "convinced of the necessity and the fairness of transferring liability"). This Court concludes that Sterling is LCGMC's successor by *de facto* merger.

## IV. STERLING'S OPERATION OF THE LAVA CAP MINE

59. In addition to concluding that Sterling is the successor to LCGMC and its liabilities, the Court also concludes that Sterling is an operator under Section 107(a) of CERCLA because it directed the activities of the Lava Cap Mine, including decisions with respect to pollution control and environmental compliance, at the time of a disposal of a hazardous substance.

### A. Sterling Operated the Lava Cap Mine

60. An operator of a facility is any person that manages, directs, or conducts "operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *United States. v. Bestfoods,* 524 U.S. 51, 66–67, 118 S.Ct. 1876, 1887, 141 L.Ed.2d 43 (1998). "If any such act of operating a corporate subsidiary's facility is done on behalf of a parent corporation, the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability." *Id.* at 65, 118 S.Ct. at 1886.

61. Under CERCLA, "operation" includes "the exercise of direction over the facility's activities." *Id.* at 71, 118 S.Ct. at 1889. Norms of corporate behavior are reference points for discerning which acts of direct operation give rise to liability and which stem from the normal investor relationship between parent and subsidiary. "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures should not give rise to direct liability." *Id.* at 72, 118 S.Ct. at 1889.

### 1. Sterling Is Not Entitled to a Presumption that Jack Gilbert Acted on Keystone's Behalf When He Responded to the Partial Collapse of the Timber Dam

62. The Supreme Court has stated several scenarios in which a parent corporation is liable for operating its subsidiary's facility. One such scenario occurs when "a dual officer or director ... depart[s] so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility." *Id.* at 71, 118 S.Ct. at 1889.

63. Although it is presumed that dual officers and directors "can and do change hats" to represent the corporations separately, *id.* at 69, 118 S.Ct. at 1888 (citing *Lusk v. Foxmeyer Health Corp.,* 129 F.3d 773, 779 (5th Cir.1997)); *see Schiavone v. Pearce,* 77 F.Supp.2d 284, 291 (D.Conn.1999); *Atlanta Gas Light Co. v. UGI Utilities, Inc.,* 463 F.3d 1201, 1205 n. 6 (11th Cir.2006), plaintiffs can rebut the presumption in various ways. *Bestfoods,* 524 U.S. at 70 n. 13, 118 S.Ct. at 1889 n. 13. Specifically,

It is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests

of the subsidiary yet nonetheless advantageous to the parent.

*Id.*

■ 64. As discussed in Findings 141–163, Jack Gilbert unquestionably directed the response to the partial collapse of the timber dam. As an initial matter and as discussed in Finding 182, there is insufficient evidence to conclude that Jack Gilbert was in fact an officer or director of Keystone when he directed the response to the partial collapse of the timber dam. As such, this Court cannot presume that he is entitled to the legal presumption of acting on Keystone's behalf.

■ 65. Even assuming Jack Gilbert was an officer or director of Keystone at that time, as discussed in Findings 141–163 and 202–209, Gilbert failed to review Cranmer's progress or follow up with Cranmer about compliance with the CAO, or to ensure the submission of a technical report and construction of lasting settling basins. The Court concludes that Gilbert's failure put Keystone at risk of an enforcement action by the Regional Water Board. The Court further concludes that these same decisions by Gilbert benefitted Sterling financially because it alone had the resources to comply, and it avoided spending resources when it decided not to comply. Thus, the Court declines to presume that Gilbert acted on Keystone's behalf when he directed the response to the partial collapse of the timber dam between 1979 and 1987. Accordingly, the Court concludes that Gilbert directed the response on behalf of, and for the benefit of, Sterling.

■ 66. Sterling argues that the CAO was rescinded, and therefore that the failure to fully implement its requirements did not place Keystone at risk of enforcement. The Court has found that the CAO was not rescinded and remained in effect. But, as discussed below, the Court concludes that

Sterling had a responsibility to fix the dam even if the CAO was rescinded.

67. By the 1980s, when Sterling had actual notice that the dam was "only debris," *see* Finding 148, and was virtually certain to fail in severe weather, *see* Finding 143, California negligence law was clear that neglect resulting in environmental harm is actionable. In *Sprecher v. Adamson Co.,* 30 Cal.3d 358, 369 n. 6, 178 Cal.Rptr. 783, 636 P.2d 1121 (Cal.1981), the California Supreme Court held that "[o]ne who takes possession of land upon which there is an existing structure … unreasonably dangerous to persons or property outside of the land is subject to liability for physical harm caused to them by the condition after … he has failed, after a reasonable opportunity, to make it safe or otherwise to protect such persons against it."

68. In *Pfleger v. Superior Court,* 172 Cal.App.3d 421, 424–25, 218 Cal.Rptr. 371 (Cal.App. 1 Dist.1985), the California Court of Appeals found uphill property owners liable for nuisance where they "had maintained their property in a dangerous condition and failed and refused to design or construct a drainage system or [take other actions] for their property adequate to … prevent future flooding of … [plaintiff's] properties.". *See also Leslie Salt Co. v. San Francisco Bay Conservation & Develop. Comm'n,* 153 Cal.App.3d 605, 622, 200 Cal.Rptr. 575 (Cal.App. 1 Dist.1984) (duty to take affirmative action "flow[s] not from the land owner's active responsibility for a condition of his land that causes widespread harm but rather, and quite simply, from his very possession and control of the land in question.").

69. Further, Sterling could not reasonably believe that its decision to place title to the real property in Keystone insulated it from liability under California law. The court in *Sprecher* held that "the duties

owed in connection with the condition of land are not invariably placed on the person holding title but rather, are owed by the person in possession of the land ... because of the possessor's supervisory control over the ... condition of the land." *Sprecher*, 30 Cal.3d at 368, 178 Cal.Rptr. 783, 636 P.2d 1121 (citation omitted); *see also Shurpin v. Elmhirst*, 148 Cal.App.3d 94, 101, 195 Cal.Rptr. 737 (Cal.App. 2 Dist. 1983) (soil engineer without ownership interest in a property may be liable for nuisance); *Portman v. Clementina Co.*, 147 Cal.App.2d 651, 659, 305 P.2d 963 (Cal. App. 1 Dist.1957) (same for independent contractor). Thus, California law imposed an obligation on Sterling to fix the dam even if the CAO did not.

### 2. To the Extent That Keystone Was Involved in the Response at All, It Acted Alongside Its Parent Sterling

70. The second scenario for parent liability offered by the Supreme Court is when a parent corporation "operates" its subsidiary's facility in the subsidiary's stead, or alongside the subsidiary "in some sort of a joint venture." *Bestfoods*, at 71, 118 S.Ct. at 1889.

71. To show that a parent operated the facility alongside the subsidiary in "some sort of joint venture," it is not necessary to establish all the formal requisites of a joint venture under the common law; the standard is more flexible than the common law definition of a joint venture. *Yankee Gas Services Co. v. UGI Utilities, Inc.*, 616 F.Supp.2d 228, 243–44 (D.Conn. 2009) ("Justice Souter, who wrote *Bestfoods*, chose his words carefully and it can be no accident that he chose the locution 'some sort of a joint venture,' as opposed to a 'joint venture.'").

72. This Court concludes, based on the evidence, that to the extent Keystone acted at all to respond to the partial collapse of the timber dam, it did so alongside its parent, Sterling. As discussed in Findings 167–209, Gilbert directed the response on Sterling's behalf much, if not all, of the time. As discussed in Findings 169–170, Gilbert's correspondence regarding the response is frequently on Sterling letterhead, and he signs as Sterling's· President. As discussed in Findings 170–171, those who implemented the response at Gilbert's direction addressed Gilbert as a Sterling official. As discussed in Finding 169, Sterling's local real estate agent sought direction from Gilbert as Sterling's President regarding environmental monitoring at the Mine. And the retained environmental consultant, Cranmer, invoiced Sterling for the monitoring it performed, and sent some results directly to Sterling. *See* Finding 171. As discussed in Finding 231, Janet Hendry's correspondence regarding the response is also on Sterling letterhead, and she signs as a Sterling official, although like Gilbert she held a Keystone officer and director position at the time. As discussed in Findings 286–288 and 299, Gilbert and Hendry testified in deposition that they did not distinguish their roles for Sterling and Keystone, as Keystone was a wholly-owned subsidiary and they saw no need to observe that formality. The Court therefore concludes that Keystone did not, in fact, act independent of Sterling to respond to the partial collapse of the dam. And, because Keystone was financially dependent on its parent, Sterling, for its continued existence during the period of the response, as discussed in Findings 185–201, the Court further concludes that Keystone was incapable of acting to respond to the partial collapse of the dam independent of Sterling.

73. The case is not unlike *United States v. Newmont USA Limited and Dawn Mining Co.*, No. CV–05–020–JLQ, 2008 WL 4621566 (E.D.Wash. Oct. 17, 2008), where the court applied the guiding

principles in *Bestfoods*. It relied upon the parent's

> "direct connection to the operations of the Mine" to find it liable as an operator, and also found relevant that "Newmont's inextricably interwoven involvement in the management of Dawn [its subsidiary] departed from the accepted norms of corporate oversight.... Both in terms of degree and detail, Newmont's involvement in reviewing and managing Dawn's operations exceeded the actions typically associated with investor status such as, oversight of finance and budgetary choices, monitoring performance and expression of general policies.... The facts show a level of participation and control by Newmont that exceeds the bounds of a merely interested investor and instead became an active operator."

*Id.* at \*50; *see also United States v. Kayser–Roth Corp.*, 272 F.3d 89 (1st Cir.2001) (parent corporation's control of subsidiary's environmental operations represented "pervasive control" sufficient to find liability); *LeClercq v. Lockformer Co.*, No. 00 C 7164, 2002 WL 908037 (N.D.Ill. May 6, 2002) (holding that parent who "took immediate and substantial actions to manage and direct the operations relating to the TCE leakage" at facility could be liable as operator in denying defendants' summary judgment motion).

74. Sterling argues that Keystone alone responded to the partial collapse of the timber dam, and that the use of Sterling letterhead and Sterling titles when corresponding about the response was just a mistake on Gilbert's part. It points to evidence in the record suggesting that people involved in the response regarded Keystone as the responsible party, including Cranmer, Carey and Regional Water Board officials. However, as discussed in Findings 170–171, all of these people turned to Gilbert as Sterling's President, not a Keystone official, when they had questions about the response. The Court concludes that to the extent that Keystone acted at all, it did not act independent of Sterling.

■ 75. Moreover, to the extent that Gilbert acted on Keystone's behalf to respond, this Court concludes that he did so out of a contractual obligation to Sterling. As discussed in Findings 170–171, Sterling entered into an agreement with Gilbert's family company, Steel Investments, to provide management and administrative services to Sterling and its subsidiaries, including Keystone. As a condition of the Steel Management Agreement, Gilbert was to make himself available to act as a Keystone officer and director. The Court concludes that Gilbert's actions as a Keystone officer and director during the term of the Steel Management Agreement were performed under an obligation to Sterling, and therefore that they were not taken independent of Sterling.

### 3. Other Evidence of Sterling's Control of Keystone and the Mine Is Relevant to The Court's Operator Liability Analysis Under *Bestfoods*

■ 76. *Bestfoods* does not limit a court's scrutiny of parent activity to the parent's activity with respect to environmental decisions. When discussing how to analyze direct parent operator liability, the *Bestfoods* Court observed that "the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." 524 U.S. at 71, 118 S.Ct. at 1889. Accordingly, the Court concludes that the evidence that Sterling controlled many other aspects of Keystone's actions is relevant to its analysis of Sterling's operator liability under *Bestfoods*.

77. Numerous federal courts have considered the totality of circumstances when

determining whether a parent corporation should incur direct operator liability at a facility. In *Newmont USA*, 2008 WL 4621566, the court found that Newmont, the parent corporation of Dawn Mining Company, was liable as an operator. While stressing Newmont's "direct connection to the operations of the Mine," the court also considered the closeness of the relationship between Newmont and Dawn, Newmont's representation on the Dawn Board of Directors, the interlocking directors and officers between the companies, Newmont's general financial oversight over Dawn, and Newmont's monitoring of Dawn's performance. *Id.* at *50. The court stated that such facts are "relevant in this case because in degree and detail, Newmont's inextricably interwoven involvement in the management of Dawn departed from the accepted norms of corporate oversight." *Id.*

78. Similarly, the court in *Basic Management Inc. v. United States*, 569 F.Supp.2d 1106 (D.Nev.2008), found that all of the parent's activities at the facility resulted in operator liability. The court found that the parent, Anaconda, was an operator based on, *inter alia*, "overlapping managers, directors, and employees of Anaconda and [its subsidiary], Anaconda's involvement in . . . daily operations of the facility, and Anaconda's involvement in the . . . funding of waste management and disposal systems." *Id.* at 1116. Based on the facts, the court held that the "Plaintiffs have shown sufficient involvement by Anaconda beyond the norms of parental supervision to establish that Anaconda was an operator of the facility, thereby rendering [Anaconda's predecessor in interest] directly liable for its actions." *Id. See also Kayser–Roth*, 272 F.3d 89 (parent corporation's control of subsidiary's environmental operations represented "pervasive control" sufficient to find liability) and *Atlanta Gas Light*, 463 F.3d at 1205–07 ("Looking at the facts through the prism of corporate norms, as required by *Bestfoods*," the court examined evidence of the parent's non-environmental management of facility, including parent's dominance nominating the subsidiary's superintendents and approving their salaries and a management contract between the parent and subsidiary when evaluating a direct parent operator claim).

79. In *Browning–Ferris Industries of Illinois, Inc. v. Ter Maat*, 13 F.Supp.2d 756, 764–65 (N.D.Ill.1998), *aff'd in part, rev'd in part*, 195 F.3d 953 (7th Cir.1999), the court applied a *Bestfoods* analysis to conclude that a company called AAA was directly liable, at the very least, as a joint operator of its sister company's (MIG's) facility. In this case, MIG was the operator of the landfill per a lease and AAA was a transporter to the landfill. Richard Ter Maat served as an officer of both corporations. *Id.* at 762. In reaching this decision, the court explained "that the dispositive question is whether [Richard Ter Matt's] conduct and that of AAA was done outside the norms of corporate conduct so as to be considered done on behalf of AAA rather than MIG." *Id.* at 764. Similar to the kind of evidence in the record here, the court considered the following "pertinent evidence" in reaching its conclusion:

> MIG paid AAA a management fee to reimburse AAA, in part, for its performing certain administrative functions for MIG related to the site. Numerous outside parties who were involved with the site, including the [Illinois EPA or IEPA] and waste haulers, considered AAA to be the operator. Some vendors sent correspondence and invoices to AAA for services related to site operations. Additionally, Richard Ter Maat sent several letters to the IEPA pertaining to operational matters at the site which he signed as president of AAA. He also sent a letter to the Illinois Division of Land/Noise Pollution Control

pertaining to an operating permit for the site which was also signed by him as president of AAA. While defendants attempted to explain these letters away as aberrations, the letters speak for themselves. Furthermore, there are several letters from AAA's environmental consultant, M. Rapps Associates Inc., addressed to Richard Ter Maat and AAA which discuss pollution and clean-up issues at the site.

*Id.* at 764–65. Like Ter Maat of AAA, as discussed in Findings 169–170, Jack Gilbert consistently did business on Sterling letterhead signing as Sterling's President when taking action to respond to the partial collapse of the timber dam. He proposed that Sterling contract with his family company Steel for the provision of management services to Keystone. *See* Findings 173–184. He tasked Sterling agent Leonard Carey with the job of implementing Gilbert's response to Regional Water Board compliance orders. *See* Findings 167–169. Cranmer sent its invoices for water monitoring to Gilbert, and Sterling paid them, because Keystone could not. *See* Findings 185–201.

80. Also akin to this case, the *Browning–Ferris Indus.* court found unremarkable the existence of correspondence between MIG and IEPA and MIG and AAA's environmental consultant, stating, "[a]ll this shows ... at best is that AAA and MIG both were involved as operators at the site." *Browning–Ferris Indus.,* 13 F.Supp.2d at 765. The same can be said for Sterling and Keystone's respective involvement in making the environmental decisions about the Lava Cap Mine. *See* Findings 210–215.

■ 81. This Court holds, based on the record, that Sterling's pervasive control and management over the Lava Cap Mine exceeded actions typically associated with a parent's investor status. *See Bestfoods,* 524 U.S. at 72, 118 S.Ct. at 1889.

82. To the degree Keystone operated the Mine, Sterling's pervasive management of the Mine and control over Keystone leads this Court to conclude that Keystone acted alongside its parent, Sterling, in a joint venture of the type recognized in *Bestfoods. Id.* at 71, 118 S.Ct. at 1889; *see Yankee Gas Services Co.,* 616 F.Supp.2d at 243–244.

### 4. The Court Declines to Apply Canadian Norms under *Bestfoods*

■ 83. Sterling urges the Court to consider Canadian corporate norms in assessing whether its conduct with respect to Keystone and the Mine exposes it to operator liability under CERCLA. The Court concludes that, to the extent there is any difference between Canadian corporate norms and those in the United States, American corporate norms would control. The Mine is located in California. Keystone was a California corporation. The persons most likely to be immediately and directly affected by Sterling's conduct *vis a vis* environmental matters relating to Keystone and the Mine are in California, in the vicinity of the Mine. To the extent Sterling "operated" the Mine, those operations occurred in California. The burden of responding to environmental conditions at the Site, in the absence of a full and adequate response by Sterling or Keystone, falls to U.S. governmental authorities, including the State of California and the United States. Therefore, the Court believes it is fair and appropriate to look to American law to determine what is normal for companies acting here.

■ 84. The Court's conclusion is further supported by choice of law principles. When competing bodies of law from two jurisdictions are presented by opposing parties, California courts apply the law of the jurisdiction whose interest would be most impaired if the other jurisdiction's

law is applied. *Brown v. Baden (In re Yagman)*, 796 F.2d 1165, 1170 (9th Cir. 1986). "This choice of law analysis embodies the presumption that California law applies unless the proponent of foreign law can show otherwise." *Schlumberger Logelco Inc. v. Morgan Equipment Co.*, 1996 WL 251951 (N.D.Cal. May 3, 1996) (citing *Browne v. McDonnell Douglas Corp.*, 504 F.Supp. 514, 517 (N.D.Cal.1980)).

85. Failure to apply California laws and norms would impair California's interests to a greater degree than Canada's. California has an inherent interest in applying its own laws to corporations operating within its borders. It also has a significant interest in protecting the health and welfare of its citizens and protecting its environmental and natural resources. There are no similar factors supporting the application of Canadian law or norms in these circumstances.

86. The record establishes at least two corporate norms that apply to parent-subsidiary relationships: the ritual of holding and recording separate meetings and the clear representation of corporate identity in communications with outside parties. *See* Findings 279–280. *See also S.H. Riddle v. Leuschner*, 51 Cal.2d 574, 581, 335 P.2d 107 (1959) ("normal corporate procedures" include following corporate formalities such as holding meetings and keeping records); *Stark v. Coker*, 20 Cal.2d 839, 129 P.2d 390 (1942). This view is further bolstered by contemporaneous scholarship. *See* Douglas and Shanks, *"Insulation from Liability Through Subsidiary Corporations,"* Yale Law Journal, 1929; Cataldo, *"Limited Liability with One Man Companies and Subsidiary Corporations,"* Law and Contemporary Problems, 1953.

87. Sterling's deviation from these norms supports the Court's conclusion that Sterling was directly operating Keystone and the Lava Cap Mine.

88. Aside from the conclusion above that U.S. corporate norms, as reflected in California law for purposes of this matter, should apply here, the Court faces the practical problem that the record contains no credible articulation of Canadian corporate norms and no basis to conclude that they differ from the U.S. norms identified above. As set forth in Findings 305–323, the only testimony purporting to articulate Canadian corporate norms, from Defendant's expert witness John Smith, lacks foundation and therefore relevance and reliability.

89. Moreover, even if Smith's testimony as to Canadian norms had been credible, his own testimony established that Sterling deviated from such norms on multiple occasions. *See* Findings 324–329.

## B. CERCLA "Disposals" Occurred During Sterling's Operation of the Lava Cap Mine

90. In order for Sterling to be liable, it must operate the facility at the time of a "disposal" of a hazardous substance. 42 U.S.C. § 9607(a).

91. CERCLA defines "disposal" as "the *discharge*, deposit, injection, *dumping, spilling, leaking*, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *See* 42 U.S.C. § 9601(29), referencing 42 U.S.C. § 6903(3) (emphasis added). In comparison, CERCLA defines "release" as "any *spilling, leaking*, pumping, pouring, emitting, emptying, *discharging*, injecting, escaping, leaching, *dumping*, or *disposing* into the environment (including the abandonment or discharging of barrels, containers, and other closed receptacles containing any hazardous substance

or pollutant or contaminant)...." *See* 42 U.S.C. § 9601(22) (emphasis added to show common terms between the CERCLA definitions of disposal and release).

92. Based on these definitions, the Ninth Circuit concluded that "words used more than once in the same statute have the same meaning ....; [t]herefore, 'release' is broader than 'disposal' because the definition of 'release' includes 'disposing'.... But, at the same time, the definition of 'disposal' and 'release' have several words in common: 'discharge,'/ 'discharging'; 'injection'/'injecting'; 'dumping' 'spilling'; and 'leaking.'" *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 878 (9th Cir.2001) (*en banc*). To give meaning to these words, the *Carson Harbor* court instructed that, "[i]nstead of focusing solely on whether the terms are 'active' or 'passive,' we must examine each of the terms in relation to the facts of the case and determine whether the movement of contaminants is, under the plain meaning of the terms, a 'disposal.' Put otherwise, do any of the terms fit the hazardous substance contamination at issue?" *Id.* at 879.

93. "Congress did not limit 'disposal' to the initial introduction of hazardous material onto property." *Id.* at 877 (citing *Kaiser Aluminum & Chem. Corp. v. Catellus Development Corp.*, 976 F.2d 1338, 1342 (9th Cir.1992)). Rather, "it is evident that CERCLA's primary targets included spills and leaks from *abandoned sites—sites at which there was no longer any affirmative human activity.*" *Id.* at 885 (emphasis added). "[I]f 'disposal' is interpreted to exclude all passive migration, there would be little incentive for a landowner to examine his property for decaying disposal tanks, prevent them from spilling or leaking, or to clean up contamination once it was found." *Id.* at 881.

94. Sterling does not dispute, and this Court concludes, that there was a "disposal," as that term is defined in Section 101 of CERCLA, of a hazardous substance at the Lava Cap Mine prior to 1952, during the time LCGMC owned and operated the Lava Cap Mine.

95. This Court further concludes that there was a "disposal," as that term is defined in Section 101 of CERCLA, of a hazardous substance at the Lava Cap Mine after 1952, during the period of Sterling's operation. As discussed in Findings 165–166, the partial collapse of the timber dam in 1979 resulted in the spilling, leaking and dumping of arsenic-laden tailings and water into the environment. The Court concludes that this event itself is properly characterized as a "disposal" under CERCLA. Moreover, there is evidence of additional and continuous spilling of arsenic-contaminated water and tailings, both before and after the dam collapse. Thus, the Court concludes that the disposals were ongoing throughout the period of Sterling's operation.

## V. CERCLA IS CONSTITUTIONAL

96. Sterling argues that *Nat'l Fed. of Indep. Business v. Sebelius ("NFIB")*, —— U.S. ——, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012), renders CERCLA unconstitutional as applied to this case. In *NFIB*, the Supreme Court dealt with the constitutionality of the Patient Protection and Affordable Care Act. One of the key provisions of the Act is the "individual mandate," which requires most Americans to maintain "minimum essential" health insurance coverage. *Id.*, 132 S.Ct. at 2580. For many individuals, the means of satisfying this requirement is to purchase insurance from a private company. *Id.* The question before the Court was whether Congress had the power under the Commerce Clause to compel individuals not otherwise engaged in interstate commerce to become engaged. The Court held that the individual

mandate did not regulate existing commercial activity, and also required commercial activity. *Id.,* 132 S.Ct. at 2588. The Court held that the regulation of inactivity was beyond Congress' powers under the Commerce Clause. *Id.,* 132 S.Ct. at 2589–91.

97. Sterling again portrays its decades of neglect as a virtue—an "inactivity" that the Commerce Clause does not permit Congress to regulate. As an initial matter, the Court concludes that, even if Sterling's interpretation of *NFIB* were correct, which it is not, Sterling was anything but inactive. As discussed in Finding 151, Sterling stored contaminated tailings for 37 years without any effort to maintain the timber dam to ensure its integrity and the safety of the tailings impound. Further, it inadequately responded to a spill, which contaminated downstream areas. Sterling's argument, if adopted by this Court, would encourage owners and operators to ignore hazardous conditions on their property in hopes that it would insulate them from CERCLA liability.

98. Moreover, this Court declines to adopt Sterling's interpretation of *NFIB.* While Sterling rests it argument on a snippet from the concurring and dissenting opinion of Justice Ginsberg, the Court finds the analysis of the *NFIB* majority more useful. The Supreme Court stated that "[t]he individual mandate, however, does not regulate existing commercial activity. It instead compels individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." *Id.,* 132 S.Ct. at 2587 (emphasis in the original). "The power to *regulate* commerce presupposes the existence of commercial activity to be regulated." *Id.* at 2572 (emphasis in the original).

99. CERCLA, on the other hand, does not require a person without any connection to hazardous substances to become involved with hazardous substances. Rather, it regulates the conduct of owners and operators of facilities containing hazardous substances. As an operator of the Lava Cap Mine, Sterling was clearly engaged in commerce and voluntarily chose to become involved with the Lava Cap Mine. It voluntarily purchased the Lava Cap Mine in 1952, sold surplus mine equipment and pursed reopening the Mine. No one forced Sterling to ignore the continuous discharges of contaminated water into the environment, or to allow the timber dam to deteriorate to the point of failure. Unlike the individuals discussed in *NFIB,* it was not forced "to purchase an unwanted product." *Cf. NFIB,* 132 S.Ct. at 2586.

100. If Sterling's position controlled, CERCLA's provision that present owners are liable for the costs of the cleanup would also be unconstitutional where an owner's only activity is to purchase land. Yet, the Court observes that no court has ever suggested that an owner of contaminated property cannot be compelled to assist in its clean up. Indeed, in *United States v. Domenic Lombardi Realty,* 204 F.Supp.2d 318 (D.R.I.2002), the defendant was a property management company that purchased a site, which was later discovered to be contaminated with PCBs. The defendant challenged the constitutionality of CERCLA under the Commerce Clause, and the court had no difficulty finding that "CERCLA is a constitutional exercise of Congress's Commerce Clause power." *Id.* at 324.

101. The Court also observes that the Supreme Court has repeatedly stressed that it will presume that a statute enacted by Congress is constitutional. *Bowen v. Kendrick,* 487 U.S. 589, 617, 108 S.Ct. 2562, 2579, 101 L.Ed.2d 520 (1988); *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). Consistent with this respect for the constitu-

tionality of acts of Congress, CERCLA has survived every challenge to its constitutionality. *See, e.g., Freier v. Westinghouse Elec. Corp.,* 303 F.3d 176, 203 (2nd Cir.2002) ("Clearly, CERCLA itself was enacted as a valid response to a national problem, was directly related to a valid congressional concern, and was within Congress's powers under the Commerce Clause."); *United States v. Olin Corp.,* 107 F.3d 1506, 1510 (11th Cir.1997); *United States v. NL Indus. Inc.,* 936 F.Supp. 545, 563 (S.D.Ill.1996); *Nova Chemicals, Inc. v. GAF Corp.,* 945 F.Supp. 1098, 1105 (E.D.Tenn.1996) ("CERCLA does not violate the Commerce Clause."); *United States v. Alcan Aluminum Corp.,* 87–CV–920, 91–CV–1132 (Consolidated), 1996 WL 637559, *6–7, 1996 U.S. Dist. LEXIS 16358, *20 (N.D.N.Y. Oct. 25, 1996).

102. Moreover, unlike the individual health insurance that *NFIB* found not to be subject to regulation under the Commerce Clause, the Supreme Court has held that both hazardous waste and ground water are articles of commerce subject to regulation under the Commerce Clause. *See Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources,* 504 U.S. 353, 359, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992); *Sporhase v. Nebraska, ex rel. Douglas,* 458 U.S. 941, 953–54, 102 S.Ct. 3456, 3462–63, 73 L.Ed.2d 1254 (1982). The Court therefore concludes that Congress's regulation of hazardous substances under the Commerce Clause is a valid exercise of its power under the Commerce Clause, even as to defendants like Sterling, who fail to take steps to prevent an environmental disaster.

103. In a similar vein, Sterling argues that it cannot be held liable under CERCLA for releases from mine waste that is attributable to the mining activity of LCGMC. The Court disagrees. CERCLA imposes an obligation on owners and operators of facilities like the Mine to respond to contaminant releases, even where there is no longer "any ongoing affirmative human activity" at the facility. *Carson Harbor,* 270 F.3d at 885. The same was true before CERCLA's enactment, when the common law of nuisance and public health statutes imposed a similar responsibility. *See Lind v. City of San Luis Obispo,* 109 Cal. 340, 341–42, 42 P. 437 (Cal.1895); *Thompson v. Kraft Cheese Co. of California,* 210 Cal. 171, 173, 178–80, 291 P. 204 (Cal.1930); *People v. Truckee Lumber Co.,* 116 Cal. 397, 400–02, 48 P. 374 (Cal.1897); Cal. Water Code § 13000 (1949); Public Health Code, 1906 Cal. Stat. 893–94. Sterling acquired all of the assets of LCGMC, including the legacy of mine waste resulting from the mining activities of LCGMC. The Court concludes that, having acquired the mine waste, Sterling had a duty to prevent its release to the environment.

## VI. THE COURT HAS JURISDICTION OVER STERLING

104. This Court has previously found that it may exercise *in personam* jurisdiction over Sterling by attributing LCGMC's contacts to Sterling under a theory of successor liability. DE 151 at 7:21–26. Having found that Sterling is the successor to LCGMC, the Court now holds that its contacts are sufficient to support the Court's exercise of jurisdiction.

105. In addition, the Court finds that it has jurisdiction to adjudicate Sterling's liability as an operator under *Bestfoods* because Sterling's own contacts with the forum are sufficient to support the Court's exercise of *in personam* jurisdiction.

106. "The requirement that a court have personal jurisdiction flows ... from the Due Process Clause. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of

individual liberty." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104, 108 S.Ct. 404, 409, 98 L.Ed.2d 415 (1987). Due process is achieved when a nonresident defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

107. The analysis is qualitative and focuses on the extent to which the defendant has availed itself of the benefits and protections of the laws of the forum state. *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 160. When applying "the flexible standard of *International Shoe,*" courts measure and balance the sufficiency of the contacts under several factors. *Hanson v. Denckla,* 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958). In the Ninth Circuit, courts apply a three-part test to evaluate whether the nature and quality of a defendant's contacts justify the exercise of specific jurisdiction: (1) the nonresident defendant must do some act or consummate some transaction within the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable. *Doe v. Unocal Corp.,* 248 F.3d 915, 923 (9th Cir.2001).

108. After considering each of these three factors, the Court concludes that it may exercise its jurisdiction over Sterling. First, the Court concludes, based on the evidence, that Sterling purposefully availed itself of the privilege of conducting business in California. Courts must examine the defendant's contacts with the forum at the time of the events underlying the dispute when determining whether they have jurisdiction. *Steel v. United States,* 813 F.2d 1545, 1549 (9th Cir.1987). Sterling purchased all the assets of the American company LCGMC, and thereafter set upon a course to reopen the Lava Cap Mine. It evaluated the Mine's profitability, it sold surplus equipment located in California, it marketed surplus surface rights using its local realtor, Leonard Carey, and it courted other mining enterprises in an effort to resume production. It also resolved numerous California workers compensation claims it inherited from LCGMC. When Sterling sold the Mine to Defendant Stephen Elder in 1989, it was a party to the transaction and received all the proceeds from the sale. And, significantly, Sterling also directed pollution control and environmental compliance decisions for the Lava Cap Mine. The "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated contacts," or of the "unilateral activity of another party or a third person." *Burger King v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). The Court concludes that all of these actions on Sterling's part were purposeful. Here, Sterling's "conduct and connection with the forum State are such that [it] should reasonably anticipate being hauled into court" in California. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

109. The Court also concludes based on the evidence that Plaintiffs' cause of action arose from Sterling's forum-related activities. Courts use a "but for" test to analyze whether a cause of action arises from a defendant's forum-related activities. *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 385–86 (9th Cir.1990), *rev'd on other grounds,* 499 U.S. 585, 111 S.Ct. 1522, 113

L.Ed.2d 622 (1991); *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir.1995). Here, the cause of action under CERCLA is based on Sterling's operation of the Lava Cap Mine. All of the activities mentioned above are relevant to the Court's finding that Sterling operated the Mine and is therefore liable under CERCLA.

110. Sterling argues that the Court may not consider its contacts unless they support an element of Plaintiffs' CERCLA claim. This Court rejects the narrow application of the "arising out of" requirement advanced by Sterling. A restrictive reading of the "arising out of" requirement is not necessary in order to protect potential defendants from unreasonable assertions of jurisdiction. *Shute*, 897 F.2d at 385. Thus, Sterling's contacts with the forum do not need to support an element of Plaintiffs' claims in order to establish jurisdiction. *Id.* The ultimate concern of the Court in evaluating whether Plaintiffs' claims arise out of, or are related to, Sterling's forum contacts is to ensure that Sterling has had "fair warning" that its actions may subject it to litigation in California. *See Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring). Nevertheless, the Court is able to conclude, even under the application of law that Sterling advocates, that Plaintiffs' claims arose out of Sterling's forum-related activities.

111. Last, the Court concludes that its exercise of jurisdiction is reasonable. Where a defendant has purposefully directed its activities at forum residents, as Sterling has, it must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184. A defendant's "contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* Courts may evaluate: (1) "the burden on the defendant"; (2) "the forum State's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies"; and (5) "the shared interest of the several States in furthering fundamental social policies." *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184.

112. Consideration of these factors in this case supports this Court's exercise of jurisdiction. Plaintiffs have a strong interest in having their case heard by an American court. CERCLA was a response by Congress to the threat to public health and the environment posed by the widespread use and disposal of hazardous substances. Its purpose was to ensure the prompt and effective cleanup of waste disposal sites and to assure that parties responsible for hazardous substances bore the cost of remedying the conditions they created. *Mardan Corp. v. C.G.C. Music Ltd.*, 804 F.2d 1454, 1455 (9th Cir.1986). American courts are uniquely qualified to hear and decide CERCLA cases.

113. Moreover, the burden to Sterling from having to litigate in American courts is minimal. Courts have recognized that, as our nearby neighbors, the burden on Canadian litigants is substantially less than for most other foreign defendants. *Aristech Chemical Int'l Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624, 628–29 (6th Cir.1998); *see also Ensign–Bickford Co. v. ICI Explosives USA Inc.*, 817 F.Supp. 1018, 1031 (D.Conn.1993).

114. Based on all of the evidence, the Court concludes that it may properly exercise *in personam* jurisdiction over Sterling.

## VII. CONCLUSION

115. Having established the Court's jurisdiction, and the four elements of Sterling's liability, Plaintiffs are entitled to a judgment of liability unless Sterling is able to invoke one of the limited statutorily permitted defenses to CERCLA liability. *See, e.g., United States v. Shell Oil Co.*, 841 F.Supp. 962, 968 (C.D.Cal.1993).

116. This Court has already entered summary judgment in favor of Plaintiffs, holding that none of the three statutorily-permitted defenses to CERCLA liability is available to Sterling. DE 152 at 12.

117. The Court finds that Plaintiffs are entitled to a judgment of liability against Sterling for all costs of removal or remedial action incurred by Plaintiffs not inconsistent with the National Contingency Plan. 42 U.S.C. § 9607(a)(4)(A).

118. Recoverable expenses include both existing costs and costs to be borne in the future. In any action under Section 107 of CERCLA, in addition to entering judgment on liability for costs already incurred, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).

119. Sterling argues that the matter of a declaratory judgment should be reserved for Phase 2 of these proceedings, during which Plaintiff's entitlement to response costs, and the amount thereof, will be adjudicated. This Court rejects that position. As the Court stated in its order bifurcating proceedings, Phase 1 of these proceedings includes discovery and trial on "Defendants' liability under Section 107(a) of CERCLA for past and future response costs." DE 26 at 1:23–25. The Court hereby enters a declaratory judgment of

liability against Sterling, pursuant to Section 113(g)(2) of CERCLA.

IT IS SO ORDERED.